GREENBERG TRAURIG LLP
James W. Perkins
Eric Sigda
Adam Kirschbaum
Met Life Building
200 Park Avenue
New York, New York 10166
(212) 801-9200
perkinsj@gtlaw.com
sigdae@gtlaw.com
kirschbauma@gtlaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
MEDTRONIC, INC., MEDTRONIC
SOFAMOR DANEK, INC., MEDTRONIC
SOFAMOR DANEK USA, INC., AND                    Case No. _____
MEDICREA USA, CORP.

      Plaintiffs,
                                                **COMPLAINT**
  -against-

JOSEPH F. WALLAND, JR.,

      Defendant.
------------------------------------- X

      For their Complaint against Defendant Joseph F. Walland, Jr., Plaintiffs state and allege as follows:

**NATURE OF THE ACTION**

      1.    This action is brought by Plaintiffs pursuant to 9 U.S.C. § 1 et seq. to compel an agreed arbitration and mediation process whereby, if mediation is unsuccessful, to arbitrate a dispute between Plaintiffs and Defendant. Plaintiffs allege that Defendant, the former chief executive officer of Plaintiff Medicrea USA, Corp., has breached restrictive covenants contained

in his Employment Agreement, which restrictive covenants were reaffirmed by Defendant in a Separation Agreement and Release he entered into at the time he terminated his employment with Plaintiffs.

2. During the pendency of this action, the mediation, and arbitration, and until further Order of this Court, Plaintiffs therefore seek an injunction from this Court enjoining Defendant from continuing to provide services to two competitors of Plaintiff Medicrea USA, Corp.

## PARTIES

3. Plaintiff Medtronic, Inc. ("Medtronic") is a Minnesota corporation with its principal place of business in Fridley, Minnesota.

4. Medtronic Sofamor Danek, Inc. is an Indiana corporation with its principal place of business in Memphis, Tennessee. Medtronic Sofamor Danek, Inc. is a wholly-owned subsidiary of Medtronic.

5. Medtronic Sofamor Danek USA, Inc. is a Tennessee corporation with its principal place of business in Memphis, Tennessee. Medtronic Sofamor Danek USA, Inc., is a wholly owned subsidiary of Medtronic Sofamor Danek, Inc.

6. Plaintiff Medicrea USA, Corp. ("Medicrea") is a Delaware corporation with its principal place of business in New York, New York. Since on or about November 12, 2020, Medicrea has been a wholly owned subsidiary of Medtronic Sofamor Danek, USA, Inc.

7. Defendant Joseph F. Walland, Jr. is, on information and belief, a citizen of the State of California.

## JURISDICTION AND VENUE

8. The Court has jurisdiction of this action pursuant to the provisions of 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

9. The Court has jurisdiction of this action pursuant to the Federal Arbitration Act, 9 U.S.C.§§ 1 et seq.

10. This Court has personal jurisdiction over Walland because, among other things, during part of the time Walland was employed by Medicrea he worked and resided in the State of New York, in this judicial district, and while employed in the State of New York in this judicial district he came to possess good will and confidential information of Medicrea which Plaintiffs seeks to protect in this action.

11. Venue is proper in this Court pursuant to the provisions of 28 U.S.C. § 1391(b)(2)) because the Southern District of New York is a judicial district in which a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred. Venue is also proper here because the parties have agreed to arbitrate their disputes in New York, New York, in which this judicial district is located.

## FACTS

A. **The Employment Agreement Between Medicrea and Walland**

12. Effective July 1, 2018, Medicrea and Walland entered into an Employment Agreement, a true and correct copy of which is attached hereto as **Exhibit A** and incorporated by reference herein ("Employment Agreement").

13. Pursuant to Section II of the Employment Agreement, Walland agreed to serve as the Chief Executive Officer of Medicrea and to undertake such duties and responsibilities as were specified therein, including but not limited to "the typical management responsibilities expected of an individual holding such position, and such other responsibilities as may be reasonably assigned to [Walland] from time to time . . . ."

14. Pursuant to Section IV(e) of the Employment Agreement, Walland agreed that "he shall relocate from California to New York by no later than December 31, 2018," and Section IV(e) also provided that Medicrea would pay relocation expenses for Walland and his family.

15. Section VI(d) of the Employment Agreement provided that if Walland "decides to terminate his employment before July 1, 2021 as a result of (and within six months of) a Change of Control, then in addition to the Accrued Obligations, [Walland] shall be entitled to receive . . ." certain compensation as specified therein.

16. Sections VII(b) of the Employment Agreement required Walland to maintain the confidentiality of Medicrea's information, observations and data obtained by Walland during the course of performance of his duties concerning the business and affairs of Medicrea.

17. Section VII(e) of the Employment Agreement provides in pertinent part that for a period of twelve months after termination of his employment with Medicrea he would not "engage in any Competitive Activity."

18. Section VII(e)(1)(a) of the Employment Agreement defined the term "Competitive Activity" to mean "performing any services (whether as an employee, consultant, independent contractor, advisor or otherwise) that are the same or similar to the services [Walland] performed in his role as CEO on behalf of [Medicrea], on behalf of any Person engaged (or about to be engaged) in the manufacture, marketing and/or sale of spinal implants anywhere in the United States in which [Medicrea] manufactures, markets, and/or sells spinal implants."

19. Section VII(e)(1)(d) of the Employment Agreement further defined the term "Competitive Activity" to mean "performing any services (whether as an employee, consultant, independent contractor, advisor or otherwise), or participating in any manner (including as an investor), with any Person that is engaged (or is attempting to become engaged) in the then-existing

business activities of the UNiD project, including, without limitation, the development, marketing, sales, and/or training of patient-specific implants used for spinal surgeries, including patient-specific implants used in cervical, lumbar, thoracic, sacral or iliac spine procedures."

20. Section VII(f) of the Employment Agreement provides that in the event Walland "breaches or threatens to breach the provisions of this Section VII, [Medicrea] may, in addition to any other rights and remedies existing in its favor, seek and obtain specific performance and/or injunctive relief or other relief in order to enforce, or to prevent any violations of the provisions hereof, so long as the requirements for establishing the right to such relief are met by the Company in accordance with applicable law."

      **B.**    **The Parties Agree to Arbitrate in this District and Court Proceedings to Enforce the Arbitration Agreement**

21. Section X of the Employment Agreement provides that "Except as provided below in this Section X, this Agreement shall be governed by and construed under the laws of the State of New York, without regard to its conflict of laws principles."

22. Section X of the Employment Agreement further provides that "In the event of any dispute arising out of or relating to this Agreement or [Walland's] employment with [Medicrea], the parties agree first to engage in prompt and serious good faith discussions to resolve the dispute. If such discussions fail to resolve the dispute within 30 days, the parties shall try to resolve the dispute through mediation using the services of JAMS. If such mediation fails to resolve the dispute, then any such dispute among the parties hereto shall be settled by final and binding arbitration before a single arbitrator in New York, New York in accordance with the rules then obtaining of the American Arbitration Association . . . ."

23. Section X of the Employment Agreement further provides that "nothing in this subsection shall be construed as precluding the bringing [sic] an action in any court of competent

jurisdiction for injunctive relief or specific performance as provided in this Agreement.  * * * This agreement to arbitrate shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.*"

24. Section XI(c) of the Employment Agreement provides that "The provisions of Section VII through Section XI of this Agreement (together with any related definitions) shall survive any termination of this Agreement."

25. Section XI(e) of the Employment Agreement provides that "This Agreement shall inure to the benefit of [Medicrea] and its respective successors and assigns.  In addition to any obligations imposed by law upon any successor to [Medicrea], [Medicrea] shall require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of [Medicrea] to expressly assume and agree to perform this Agreement in the same manner and to the same extent that [Medicrea] would be required to perform it if no such succession had taken place."

26. As provided in the Agreement Walland served as Chief Executive Officer of Medicrea beginning July 1, 2018 and was paid for such services.

### C. The Separation Agreement and Release Between Medtronic and Walland

27. On or about November 13, 2020, Medtronic acquired complete ownership and control of the capital and business (including goodwill, trade secrets and other confidential and proprietary business information) of Medicrea.

28. Medtronic and Walland agreed that by virtue of Medtronic's acquisition of Medicrea that a "Change of Control" as defined in the Employment Agreement had occurred, and Medtronic and Walland agreed to provide for termination of Walland's employment relationship with Medtronic (including any affiliate or subsidiary of Medtronic) and all agreements *except* the Employment Agreement.  Accordingly, on or about January 7, 2021, Medtronic and Walland

entered into a Separation Agreement and Release, a true and correct copy of which is attached hereto as **Exhibit B** and incorporated by reference herein ("Separation Agreement").

29. The opening paragraph of the Separation Agreement provides that it is made by Medtronic "on behalf of itself and any affiliate or subsidiary company, including Medicrea USA, Corp., that is the common law employer of Walland (collectively, 'Medtronic')." Accordingly, Medtronic Sofamor Danek, Inc., Medtronic Sofamor Danek USA, Inc., and Medicrea are all intended third party beneficiaries of the Separation Agreement.

30. Pursuant to Article 1.1 of the Separation Agreement, Walland's employment with Medtronic (including any affiliate or subsidiary thereof) was terminated effective December 10, 2020.

31. In addition to the severance payments to which Walland was entitled pursuant to the Employment Agreement in the event that he decided to terminate his employment due to a Change of Control, Medtronic agreed to pay Walland "additional consideration for the terms and provisions of this [Separation] Agreement" in the amount of $50,000.

32. Article 3 of the Separation Agreement is entitled "Release." Article 3.1 provides in pertinent part that "Walland waives and releases any claim that the restrictions in Section VII of the Medicrea Employment Agreement are not reasonable and enforceable as written, and acknowledges that these post-employment restrictions (concerning, for example, Confidential Information, Non-Competition, and Non-solicitation obligations entered into and to be enforced pursuant to New York law) shall survive this Release and remain in effect in accordance with their terms (hereafter referred to as the "Surviving Protective Covenants")."

33. Article 3.1 of the Separation Agreement further provides that "Walland acknowledges that this Release specifically covers, but is not limited to, any and all claims,

complaints, causes of actions or demands . . . which he has or may have against Medtronic relating in any way to . . . violation of the California Labor Code . . . California Government Code or California Business and Professions Code (including, without limitation, Section 17200 thereof or any unfair business practices claims) or any other theory or basis, whether legal or equitable . . . ."

34. Article 4.1 of the Separation Agreement provides in pertinent part that "Medtronic shall retain and be entitled to enforce the Surviving Protective Covenants for the benefit of itself and any affiliates, successors and assigns."

35. Article 4.2 of the Separation Agreement provides in pertinent part that "A material purpose of this Agreement is to avoid disputes over the enforceability of the Surviving Protective Covenants as written and to ensure Walland's compliance with them. Medtronic's agreement to pay Walland the full amount provided for in Section 2.2, and Walland's agreement not to contest the enforceability of the Surviving Protective Covenants are mutually dependent items of consideration.

36. Article 4.8 of the Separation Agreement provides that "Except as otherwise expressly indicated with respect to the Surviving Protective Covenants, this Agreement shall be governed by the laws of the State of California, without respect to conflict of laws principles.

**D.     The Business of Medicrea and Its Direct Competitors EOS and Alphatec**

37. Medicrea is in the business of selling implants and software-based services for use in spinal fusion procedures. Its twenty-year old business competes in three technology categories: traditional spinal implants, patient specific spinal implants and image processing services. The image processing services uses patient imaging (e.g. x-ray) and measurement software called the UNiD analyzer, a device cleared by the U.S. Food and Drug Administration ("FDA") via its 510k procedures, to make measurements and create surgical plans using predictive analytics. The surgical plan is an input to the patient specific implant that is custom manufactured on-demand.

The patient specific implant is used with traditional spinal implants in a fusion procedure. Not all Medicrea procedures use patient specific implants. All Medicrea procedures that use patient specific implants also use traditional implants.

38. As the United States chief executive officer of Medicrea, Walland was directly responsible for all United States business operations including all United States sales. Walland reported to the chief executive officer of Medicrea's parent company in France. In his role as chief executive officer of Medicrea, Walland created and implemented strategic decisions related to United States operations and participated in worldwide organizational strategic decisions as part of the executive leadership team.

39. During Medtronic's due diligence in connection with its acquisition of Medicrea, Walland was the primary United States point of contact for Medtronic. Walland was also Medtronic's primary United States contact for integration planning and post-closing integration of Medicrea's business into Medtronic.

40. In connection with his work with Medtronic before and after the acquisition of Medicrea, Walland had access to all of the confidential strategic plans related to Medicrea, including its research and development pipelines, as well as Medtronic's sales strategies and distributor integration plans for the United States.

41. Following the acquisition of Medicrea, Walland became an employee of Medtronic (or one of its subsidiaries) and in that role he was the United States sales leader for Medicrea directly responsible for distributor management, United States sales revenue, and implementation of confidential commercial strategies. One such confidential commercial strategy related to the attachment of an annual UNiD planning service to capital sales.

42. EOS Imaging, Inc. ("EOS") is a Delaware corporation with its principal place of business in St. Paul, Minnesota.

43. According to its website, EOS "is a global medical device company that provides innovative, low dose 2D/3D imaging and software solutions" which designs "unique imaging systems and Advanced Orthopedic Solutions (AOS) to collectively bridge the entire spectrum of care, from imaging to surgical planning and post-operative assessment capabilities for orthopedic surgery." https://www.eos-imaging.com/us/about-eos (last accessed April 2, 2021).

44. EOS is in the business of selling capital and software based services to create full body x-rays and plan for spinal and orthopedic procedures. The EOS imaging system generates a high quality x-ray used primarily for spinal deformity assessment. The EOS stereos software uses EOS or other images (e.g. x-ray) to make measurements and alignment assessment plans for spinal fusion surgery. EOS's stereos software, like Medicrea's UNiD analyzer, uses EOS or other images to make measurements and alignment assessments for spinal patients. EOS software systems are direct substitutes for the creation of spinal alignment measurements and Medicrea's UNiD analyzer routinely uses EOS x-rays to create surgical plans.

45. Alphatec Holdings, Inc. (Alphatec) is a Delaware corporation with its principal place of business in Carlsbad, California. According to its S-3 Registration Statement filed with the U.S. Securities Exchange Commission on March 31, 2021, Alphatec is "a medical technology company focused on the design, development, and advancement of technology for better surgical treatment of spinal disorders. Through our wholly owned subsidiaries, Alphatec Spine, Inc. and SafeOp Surgical, Inc., our mission is to revolutionize the approach to spine surgery through clinical distinction. We are focused on developing new approaches that integrate seamlessly with the Alpha InformatiX™ System to provide real-time, objective nerve information that can enhance

the safety and reproducibility of spine surgery." https://alphatecholdingsinc.gcs-web.com/node/16836/html (last accessed April 2, 2021).

46. Alphatec is in the business of selling implants and instruments for use in spinal fusion procedures. Two of Alphatec's significant product lines are Invictus and Arsenal; both are traditional spinal implant systems. Those systems are direct competitive substitutes for Medicrea's largest product line by revenue, the PASS LP screw system. PASS LP and both Alphatec systems have nearly identical FDA clearances.

47. On or about December 17, 2020, Alphatec and the French parent of EOS announced that they had entered into a "new agreement between the two companies whereby Alphatec Holdings is to acquire EOS imaging via a cash tender offer." https://www.businesswire.com/news/home/20201216006092/en/Alphatec-Holdings-and-EOS-imaging-Reach-a-New-Agreement-for-the-Acquisition-of-EOS-imaging (last accessed April 2, 2021).

48. As stated in the December 17, 2020 press release, the combination of Alphatec and EOS will "Facilitate patient specific implants" and "pre-surgical planning that improves inventory efficiency." The former is directly competitive with Medicrea's UNiD business. The latter is directly competitive with a confidential Medicrea project as to which Walland was privy to Medicrea's trade secrets and confidential information.

49. Alphatec directly competes with Medicrea's traditional implant business with Invictus. EOS directly competes with Medicrea's software business with stereos. The combined companies will compete with Medicrea's patient specific implant business.

**E.     Walland's Competitive Activity In Breach of the Employment and Separation Agreements**

50.     On or about March 30, 2021, an email was received in Walland's former email account at Medtronic (which in accordance with Medtronic policy forwards all email received to a Medtronic employee for review), a true and correct copy of which is attached hereto as **Exhibit C** and incorporated by reference herein.  The sender of the email, Mike Lobinsky, is the chief executive officer of EOS.  One of the recipients of the email was Walland.  The two other recipients of the email, Eric Dasso and David Sponsel, are respectively the Executive Vice President of Adjunctive Technologies and the Executive Vice President of Sales for Alphatec.  The email reads as follows:  "Please see attached 2021 EOS Capital RSM Comp plans for reference.  We have 2 RSM's at a quota of 7 and other (new to EOS – started 2 weeks ago) with a quote of 6.  Looking forward to building these out further as a combined business."  Attached to the email were two Excel spreadsheets, true and correct copies of which are attached hereto as **Exhibits D** and **E** and incorporated by reference herein.

51.     On the following day, March 31, 2021, Lobinsky sent a second email to Walland, Dasso and Sponsel, a true and correct copy of which is attached hereto and incorporated by reference herein as **Exhibit F**.  The email read as follows:

> **From:** Mike LOBINSKY
> **Date:** Wednesday, March 31, 2021 at 12:11 PM
> **To:** Eric Dasso , Joe Walland , David Sponsel
> **Subject:** [EXTERNAL] April 12th QPR - EOS Planning
> **Resent-From:** Joe Walland
> **Resent-Date:** Wednesday, March 31, 2021 at 12:11 PM
>
> Eric, Dave and Joe – Good spending the time together this week. As a follow up to yesterday's meeting and as we prepare for your upcoming QPR I have put together the bullet points below which were identified as "what to cover" with your sales leadership during our time on the 12th of April.
>
> **EOS:**
> 1.      Deal highlights – Why is ATEC acquiring EOS / deal rationale – Dasso

    2.    EOS overview:
    a.    Company History and install base growth over time – Mike
    b.    Portfolio (EOS, EOSedge and AOS) – Graham / Dana
    c.    Profile of the ideal EOS target (surgeon, facility) – Graham
    d.    How is EOS different than other modalities – what happens today and why is EOS solution so much better:
     i. Clinical (Patient, Surgeon, Facility) benefits – Dana
     ii. Strategic benefits – Marketing, market development, workflow efficiencies, program growth examples – Aaron
     iii. Financial rationale (ROI Examples) – Graham
    e.    High level process overview (order to install today) – EW
    3.    Sales Alignment and what is required today as well as expectations to come, What to do with leads today – Dave / Joe
    4.    Draft Comp Structure – Dave / Joe
    5.    Value prop today and plan for future – Dasso
    6.    Timelines and what's to come – Dasso, Dave, Joe
    7.    Q&A

It would be great if you could confirm the above captures what we are looking to cover in this first session and that I am not missing anything. We will assemble the presentation and will share with you early next week for initial review.

Is it also possible to schedule the time of the EOS section for mid-afternoon to allow for Monday morning travel in? If not conducive I will have those flying in arrive on Sunday night.

Thx,

52. Mike Lobinsky, the sender of the email, was advised by Medtronic that he was sending emails to an @medicrea.com email and that he should discontinue sending emails to that address.

53. Based upon the foregoing emails, and upon information and belief, it appears that Walland is taking part in strategic conversations, detailed strategic planning to merge two different companies, and the acceleration of EOS and Alphatec acting as one integrated and coordinated organization. It also appears, on information and belief, that Walland is acting or planning to act as a sales leader for Alphatec, EOS, or the combined companies with responsibilities for United States sales. It also appears, on information and belief, that Walland will be part of a "QPR"

meeting on April 12, 2021, where he will be presenting regarding compensation structure, what to do with leads, and "sales alignment." One of the Excel spreadsheets attached to Lobinsky's March 31, 2021 email contained information that appeared to have been derived from confidential Medicrea information of which Walland had knowledge.

54. Both EOS and Alphatec companies currently compete directly with Medicrea and the stated goal of the combined company is to create patient specific implants. Walland has knowledge of Medicrea trade secrets and confidential information learned during his employment with Medicrea and Medtronic that make his coordination with Alphatec and EOS a substantial competitive threat.

55. Based upon the foregoing, and on information and belief, it appears that Walland has engaged and will continue to be engaging in Competitive Activity in violation of his Employment Agreement and in violation of his Separation Agreement by performing services for Alphatec and EOS, both of which are direct competitors of Medicrea.

56. Based on the foregoing acts, Walland has breached the Employment Agreement.

57. Based on the foregoing acts, Walland has breached the Separation Agreement.

F. **Walland Is Directed to Cease and Desist**

58. By letter dated April 2, 2021, a true of correct copy of which is attached hereto as **Exhibit G** and incorporated by reference herein, Plaintiffs made demand upon Walland to cease and desist his activities which breach the Employment Agreement and the Separation Agreement.

59. Plaintiffs also made demand upon Alphatec and EOS to cease and desist permitting Walland to engage in such activities; true and correct copies of letters to Alphatec and EOS are attached hereto as **Exhibits H** and **I** and incorporated by reference herein.

60. On April 5, 2021, Plaintiffs received a written response to its demand letters to Walland, Alphatec and EOS, a true and correct copy of which is attached hereto as **Exhibit J** and

incorporated by reference herein ("Alphatec Response"). The response is signed by Jason C. Hamilton, Director, Legal Affairs and Legislation of Alphatec.

61. The Alphatec Response states that Walland is "a Vice President of Sales Channel Development at Alphatec Spine, Inc. ("ATEC")".

62. The Alphatec Response denies that the Employment Agreement or the Separation Agreement are enforceable and further denies that Walland is violating either agreement.

63. The Alphatec Responses admits that Walland "is involved with the EOS transaction" but characterizes his involvement as limited to aspects concerning the "potential alignment of EOS' sales of the physical imaging systems – the capital equipment itself – with ATEC's existing business."

64. The activities in which Walland is engaging on behalf of Alphatec as described in paragraph 63 above violate the restrictive covenants in Walland's Employment Agreement and his covenants in the Separation Agreement.

65. The Alphatec Response describes many services that Walland will allegedly not be providing at ATEC. However, apart from the activities described in paragraph 63, the Alphatec Response fails to describe the nature of Walland's new position as ATEC's Vice President of Sales Channel Development or disclose the activities he has performed, and will perform, in that role.

66. Even the activities in which Walland allegedly will be engaged in on behalf of ATEC as stated in the Alphatec Response directly concern the competitive, confidential information he received and used while employed at Medicrea and Medtronic.

67. Based on the foregoing, it appears that Walland has failed to cease and desist his breaches of the Employment Agreement and the Separation Agreement and that Walland intends to continue to engage in such breaches.

68. Further, the Alphatech Response indicates that Walland intends to disavow his obligations under the Employment Agreement and Separation Agreement.

69. Plaintiffs have been harmed and will continue to suffer irreparable harm as a result of Walland's breaches of the Employment Agreement and the Separation Agreement.

70. Plaintiffs have no adequate remedy at law.

**FIRST CAUSE OF ACTION**
**(For Specific Performance of Obligation to Mediate)**

71. Plaintiffs reallege all and singular paragraphs 1 through 70 hereinabove.

72. By reason of Walland's breaches of the Employment Agreement and the Separation Agreement as alleged herein, Plaintiffs are entitled to invoke the dispute resolution provisions set forth in Article X of the Employment Agreement.

73. Plaintiffs are entitled to an order and decree of this Court pursuant to the provisions of the Employment Agreement requiring Walland to specifically perform his obligation to try to resolve the dispute arising out of his breaches of contract through mediation using the services of JAMS.

74. Plaintiffs have no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**(For Specific Performance and Order Compelling Arbitration)**

75. Plaintiffs reallege all and singular paragraphs 1 through 74 hereinabove.

76. In the event mediation using the services of JAMS fails to resolve this dispute, Plaintiffs are entitled to an order and decree of this Court for specific performance pursuant to the provisions of the Employment Agreement, and for an Order compelling arbitration pursuant to the provisions of the Federal Arbitration Act, 9 U.S.C. §4, requiring Walland to engage in binding arbitration of this dispute in New York, New York, conducted in accordance with Article X of the Employment Agreement and the applicable rules of the American Arbitration Association.

77. Plaintiffs have no adequate remedy at law.

## THIRD CAUSE OF ACTION
### (For Injunction Pending Resolution of The Parties' Dispute)

78. Plaintiffs reallege all and singular paragraphs 1 through 77 hereinabove.

79. On information and belief, Walland has been breaching the Employment Agreement and the Separation Agreement, and intends to continue to do so, including by participating in and presenting at a combined meeting of Alphatec and EOS personnel scheduled to occur on April 12, 2021.

80. The mediation and arbitration required by the Employment Agreement cannot be completed prior to April 12, 2021, in accordance with the terms of Article X of the Employment Agreement.

81. Plaintiffs are facing and will suffer irreparable harm if Walland continues to breach the Employment Agreement and the Separation Agreement pending completion of mediation and arbitration.

82. Plaintiffs have no adequate remedy at law.

83. Pursuant to the parties' agreements and Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs are entitled to equitable and injunctive relief during the pendency of this action and in final relief, and until completion of the mediation and arbitration process, preventing Walland from in any capacity performing services of any kind or nature for, or in any other way or manner assisting, Alphatec or EOS.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment in their favor, and against Defendant Joseph F. Walland, Jr., as follows:

A.  For an Order requiring Walland to specifically perform his contractual obligation to engage in mediation with Plaintiffs using the services of JAMS.

B.  In the event that mediation fails to resolve the parties' dispute, for an Order compelling Walland to specifically perform his contractual obligation to engage in binding arbitration with Plaintiffs pursuant to Article X of the Employment Agreement and the applicable rules of the American Arbitration Association.

C.  For an injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, during the pendency of this action and until further Order of this Court, enjoining and restraining Walland from in any capacity performing services of any kind or nature for, or in any other way or manner assisting, Alphatec or EOS.

D.  Awarding Plaintiffs such other, further, or different relief as this Court deems just and equitable.

Dated: New York, New York
April 5, 2021

Respectfully submitted,

GREENBERG TRAURIG, LLP

   /s/ James W. Perkins
James W. Perkins
Eric Sigda
Adam Kirschbaum
MetLife Building, 200 Park Avenue
New York, New York
Tel: 212.801.9200
perkinsj@gtlaw.com
sigdae@gtlaw.com
kirschbauma@gtlaw.com

and

MASLON LLP

William Z. Pentelovitch (*pro hac forthcoming*)
 Peter C. Hennigan (*pro hac forthcoming*)
 John T. Duffey (*pro hac forthcoming*)
3300 Wells Fargo Center
90 S. Seventh Street
Minneapolis, MN 55402
612.672.8200

**ATTORNEYS FOR PLAINTIFFS**