# **EXHIBIT H**

# Medtronic

**Employment Law Department**
710 Medtronic Parkway, MS LC300
Minneapolis, MN 55432
USA
www.medtronic.com

Rebecca E. Goldstein
*Principal Legal Counsel*

mobile 314.409.5312
rebecca.goldstein@medtronic.com

April 2, 2021

**via email (**JHamilton@atecspine.com**)**

Jason C. Hamilton
Director, Legal Affairs & Litigation
ALPHATEC SPINE, INC.
1950 Camino Vida Roble
Carlsbad, CA 92008

RE: **Joseph F. Walland Jr. Post-Employment Restrictions**

Dear Mr. Hamilton:

As you know, Medtronic and Alphatec Spine are direct competitors in the business of manufacturing, marketing and/or selling spinal implants, spinal measurement/alignment software and spinal medical imaging technologies in the United States and are engaged or preparing to be engaged in the business activities of Medtronic's UNiD project. It has come to our attention that Joseph F. Walland, Jr., the former CEO of Medicrea USA, Corp, which is now part of Medtronic, is performing services for your company either as an employee, consultant, contractor, or in some other capacity.

We wish to advise you that Mr. Walland is party to an Employment Agreement with Medicrea USA, Corp dated effective July 1, 2018, which was subsequently assigned to Medtronic (copy attached). On January 7, 2021, Mr. Walland signed a Separation Agreement and Release ("Separation Agreement") with Medtronic for which he was paid good and valuable consideration. In Article 3.1 of the Separation Agreement, Mr. Walland acknowledged that the post-employment restrictions in his Employment Agreement (referred to as the "Surviving Protective Covenants") would survive the Separation Agreement and remain in effect according to their terms. In Article 4.1 of the Separation Agreement, Mr. Walland agreed that "Medtronic shall retain and be entitled to enforce the Surviving Protective Covenants for the benefit of itself and any affiliates, successors, and assigns."

In the Surviving Protective Covenants in Section VII(e) of Mr. Walland's Employment Agreement, he agreed that he would not "engage in any Competitive Activity during the Period of Employment and/or during the Restricted Period, or any extension thereof as provided below." Section VII(e)(1)(a) defines "Competitive Activity" to mean directly or indirectly "performing any services (whether as an employee, consultant, independent contractor, advisor or otherwise) that are the same or similar to the services the Executive performed in his role as CEO on behalf of the Company, on behalf of any Person engaged (or about to be engaged) in the manufacture, marketing and/or sale of spinal implants anywhere in the United States in which the Company Group manufactures, markets, and/or sells spinal implants." Section VII(e)(1)(d) defines

Jason C. Hamilton
April 2, 2021
Page 2

"Competitive Activity" to mean directly or indirectly "performing any services . . . or participating in any manner . . . with any Person that is engaged (or is attempting to become engaged) in the then-existing business activities of the UNiD project, including without limitation, the development, marketing, sales and/or training of patient-specific implants used for spinal surgeries, including patient-specific implants used in cervical, lumbar, thoracic sacral or iliac spine procedures."

It has come to our attention that Mr. Walland is meeting with you and providing services to you. Specifically, and without limiting the generality of the foregoing, it has come to our attention that Mr. Walland will be meeting with you on or about April 12, 2021 and making presentations on matters such as sales alignment and compensation structure. Mr. Walland's involvement with you is Competitive Activity as defined in his Employment Agreement, and such activity violates the Employment Agreement. By permitting Mr. Walland to continue to perform services for you with knowledge of his obligations to Medtronic, and without justification, you are tortiously interfering with Medtronic's contractual rights. Medtronic expressly reserves all of its rights and remedies, including all rights and remedies pursuant to the Employment Agreement, the Separation Agreement, in contract, in tort, and at law or in equity.

Accordingly, Medtronic hereby demands that you immediately cease and desist from permitting Mr. Walland to perform any services for you, and that you immediately disclose to Medtronic all activities in which he has engaged on your behalf to this point in time, including all information he has disclosed to you that is or might be proprietary or confidential information belonging to Medtronic. This letter is being sent to you pursuant to Section X of Mr. Walland's Employment Agreement as Medtronic's initiation of prompt and serious good faith discussions to resolve this dispute. Please respond to me no later than 5 pm Central Time on Monday, April 5, with this information and confirmation of your company's compliance with these obligations.

Sincerely,

**MEDTRONIC, INC.**

Rebecca E. Goldstein
Principal Legal Counsel

REG/br

attachment

## Employment Agreement

This Agreement (this **"Agreement"**) is made effective as of July 1, 2018, by and between Medicrea USA, Corp. (the **"Company"** or **"Medicrea USA"**), and Joe Walland (the **"Executive"**).

In consideration of the mutual covenants contained in this Agreement, the parties hereby agree as follows:

### SECTION I
### EMPLOYMENT

The Company desires to employ the Executive in such capacity as set forth below, and the Executive agrees to be employed by the Company, upon the terms and conditions provided in this Agreement.

### SECTION II
### POSITION AND RESPONSIBILITIES

During the Period of Employment (defined below), the Executive agrees to serve as Chief Executive Officer of the Company. In such capacity, the Executive will be responsible for the typical management responsibilities expected of an individual holding such position, and such other responsibilities as may be reasonably assigned to the Executive from time to time by the President and CEO of Medicrea International, consistent with such position. These duties shall include, without limitation (in each case under the direction of Medicrea International CEO): (i) driving aggressive growth through development and execution of sound growth strategies; (ii) hiring, leading and developing other Company leaders and establishing a management method designed to ensure the achievement of the Company's goals for U.S. development and growth; (iii) participating in roadshows and investor meetings and establishing Medicrea among the U.S. financial investor community and (iv) running the end to end operation of Medicrea USA and the fiduciaries duties attached the role of any traditional CEO of a sales subsidiary. The Executive shall be expected to undertake extensive travel to perform his duties pursuant to this Agreement, including locations within and outside the U.S., including, without limitation, Medicrea International's headquarters in France. The Executive will report to Denys Sournac, President and CEO of Medicrea International (or his successor). The Executive further agrees that the Company may transfer the Executive's employment to a parent, subsidiary or affiliate of the Company, in which case references in this Agreement to the Company shall refer to such parent, subsidiary or affiliate.

### SECTION III
### TERM AND DUTIES

a)   Period of Employment.

The period of the Executive's employment under this Agreement will commence as of July 1, 2018 (the **"Effective Date"**), and shall continue through the Termination (as defined below) of the Executive's employment pursuant to the terms of this Agreement (the **"Period of Employment"**).

1

b)   Duties.

During the Period of Employment, the Executive shall be employed by the Company on a full-time basis and shall devote his full business time, attention and skill to the business and affairs of the Company and its parent, subsidiaries and affiliates (the "**Company Group**"). The Executive represents and warrants that the Executive is under no fiduciary or contractual obligation to another company, venture, business or employer that would prevent the Executive from being employed by the Company or from fully performing the duties as set forth herein. The Executive will perform faithfully the duties that may be assigned to him from time to time by the President and CEO of Medicrea International. Subject to the terms hereof, the Executive shall at all times be subject to, comply with, observe and carry out the Company's rules, regulations, policies and codes of ethics and/or conduct applicable to employees of the Company generally and in effect from time to time. If the Executive's other business or financial interests present a conflict of interest or the appearance of a conflict of interest, the Executive shall fully disclose the conflict or apparent conflict to the President and CEO of Medicrea International.

SECTION IV
COMPENSATION

For all services rendered by the Executive in any capacity during the Period of Employment, the Executive shall be compensated as follows:

a)   Base Salary.

The Company shall pay the Executive, in accordance with the Company's normal payroll procedures, a base salary ("**Base Salary**") that initially is at an annual rate of $250,000.

b)   Annual Bonus

The Executive shall be eligible to receive an annual bonus (payable quarterly) based upon the achievement of quantitative and qualitative objectives to be determined by the President and CEO of Medicrea International, in consultation with the Executive.

For calendar 2018, the Executive shall be eligible to receive an annual bonus of up to $200,000 (*i.e.*, $50,000 per quarter) based on 100% year-over-year growth of UNiD cases versus 2017 and 25% year-over-year growth of revenue versus 2017. This bonus is inclusive of all amounts previously received and/or to be received by the Executive with respect to 2018 commissions under his prior employment agreement with the Company.

For calendar 2019, the Executive shall be eligible to receive an annual bonus of up to $250,000 (*i.e.*, $62,500 per quarter), as follows: (i) $125,000 for 100% or more year-over-year growth of UNiD cases versus 2018, with the Executive eligible for a pro rata bonus payment if between 50% - 99% growth is achieved; and (ii) $125,000 for 25% or more growth on revenue compared to 2018, with the Executive eligible for a pro rata bonus payment if 10% - 24% growth is achieved.

For 2020 and thereafter, the objectives will be determined as described above, provided that the annual bonus amount when objectives are 100% achieved shall not be lower than $250,000 annually.

Notwithstanding that bonuses are payable quarterly as described herein, such bonuses shall not be deemed "earned" for purposes of Section VI(B) of this Agreement until completion of the calendar year to which they relate.

c) <u>Benefits</u>.

The Executive shall be provided the opportunity to participate in such employee benefit plans or programs maintained by the Company from time to time for which he is eligible, on terms and conditions comparable to those applicable to such other employees generally whose positions are commensurate with the Executive's. The Executive shall be entitled to 1.75 days of paid vacation per month (*i.e.*, 20 vacation days per calendar year); accrued days will not be carried over into any following year. Nothing contained herein shall be construed to limit the Company's ability to amend, suspend, or terminate any such standard employee benefit plan or policy at any time without providing the Executive notice, and the right to do so is expressly reserved.

d) <u>Car Allowance</u>.

The Executive shall be provided a car allowance of $500.00 gross per month.

e) <u>Relocation</u>.

The Executive agrees that he shall relocate from California to New York by no later than December 31, 2018. The Company will reimburse the Executive's relocation expenses actually incurred (as evidenced by written invoices), up to a maximum of $30,000, for relocation of the Executive and the Executive's family from California to New York.

f) <u>Housing allowance</u>.

The Executive shall be provided a housing allowance of $75,000 gross per year, payable in monthly installments of $6,250, for a period of two years from the date Executive relocates to New York.

g) <u>Stock Option</u>

The Executive shall be granted 50.000 by the first board meeting taking place after the Effective Date of this Agreement.

SECTION V
<u>BUSINESS EXPENSES</u>

The Company will reimburse the Executive for all documented reasonable travel, accommodations and other business expenses incurred by the Executive in the performance of his duties and obligations under this Agreement, consistent with the Company's policies on

3

business expenses, subject to the Company's requirements with respect to reporting of such expenses.

## SECTION VI
## EFFECT OF TERMINATION OF EMPLOYMENT

a) The parties agree that the Executive is employed at-will. The Company or the Executive may terminate the Executive's employment, with or without advance notice, and with or without Cause, in each case upon written notice to the other party (a "*Termination*").

b) In the event of a Termination for any reason, the Executive will be entitled to receive, and the Company will pay to the Executive (or in the event of his death, his estate or beneficiaries), (i) all accrued but unpaid Base Salary through the date of Termination, (ii) any unpaid or unreimbursed business expenses incurred in accordance with Section V hereof, upon receipt of appropriate documentation, consistent with the Company's policies, (iii) any accrued, but unused vacation and (iv) earned but unpaid bonus under Section IV(B) as of the Termination date (the "*Accrued Obligations*").

c) In the event of a Termination initiated by the Company without Cause, then, in addition to the Accrued Obligations: (1) if the termination date occurs before July 1, 2020, the Executive will be entitled to receive (i) a payment equal to $500,000, less the gross base salary amounts paid to him between the Effective Date and last date that the Executive is on the Company's payroll, and (ii) reimbursement of relocation expenses actually incurred (as evidenced by written invoices), up to a maximum of $30,000, for relocation of Executive and Executive's family back to California, provided that such relocation takes place within six (6) months of the termination date; or (2) if the termination date occurs after June 30, 2020 and before July 1, 2021, the Executive will be entitled to receive (i) a payment equal to three (3) months' base salary at the Executive's then-existing base salary rate, and (ii) reimbursement of relocation expenses actually incurred (as evidenced by written invoices), up to a maximum of $30,000, for relocation of Executive and Executive's family back to California, provided that such relocation takes place within six (6) months of the termination date. "*Cause*" means: (a) dishonesty, fraud, or breach of fiduciary duty with respect to the Company and the Executive's duties, (b) gross negligence or insubordination in the performance of the Executive's duties, (c) willful misconduct with regard to the Company, its business, assets, or employees, (d) a breach of any obligation undertaken by the Executive in this Agreement, (e) willful and/or material violation of any Company policies or rules as may be in effect from time-to-time; or (f) committing any felony or any other crime involving fraud, dishonesty, or moral turpitude.

d) In the event that the Executive decides to terminate his employment before July 1, 2021 as a result of (and within six months of) a Change of Control, then in addition to the Accrued Obligations, the Executive shall be entitled to receive (i) a payment equal to three (3) months' base salary at the Executive's then-existing base salary rate, and (ii) reimbursement of relocation expenses actually incurred (as evidenced by written invoices), up to a maximum of $30,000, for relocation of Executive and Executive's family back to California, provided that such relocation takes place within six (6) months of the termination date. "*Change of Control*" means the sale of all or substantially all the assets of Company; any merger, consolidation or acquisition of Company with, by or into another corporation, entity or person; or any change in

the ownership of more than fifty percent (50%) of the voting capital stock of the Company, in one or more related transactions.

e) In the event that the Executive decides to terminate his employment before July 1, 2021 as a result of (and within six months of) Good Reason, then in addition to the Accrued Obligations, the Executive shall be entitled to receive (i) a payment equal to three (3) months' base salary at the Executive's then-existing base salary rate, and (ii) reimbursement of relocation expenses actually incurred (as evidenced by written invoices), up to a maximum of $30,000, for relocation of Executive and Executive's family back to California, provided that such relocation takes place within six (6) months of the termination date. **"Good Reason"** means (a) any failure to pay or provide, or any material reduction in, Executive's base salary, fringe benefits or bonus eligibility; (b) a substantial, adverse change in the nature or scope of Executive's responsibilities which amounts to the functional equivalent of a demotion; or (c) Executive is required to move his office to a location more than 30 miles from the location where Executive's office is currently located.

f) Upon the Termination of the Executive's employment for any reason (unless otherwise agreed in writing by the Company and the Executive), the Executive will be deemed to have resigned, without any further action by the Executive, from any and all officer and/or director positions and/or Board membership that the Executive, immediately prior to such Termination, (i) held with the Company, its parent, subsidiaries or affiliates and (ii) held with any other entities at the direction of, or as a result of the Executive's affiliation with, the Company, its parent, subsidiaries or affiliates. If for any reason this Section VI(E) is deemed to be insufficient to effectuate such resignations, then the Executive will, upon the Company's request, execute any documents or instruments that the Company may deem necessary or desirable to effectuate such resignations.

g) As a condition to receipt to any of the post-termination payments or benefits described in Sections VI(C) or VI(D), the Executive must execute and not revoke a general release of claims in favor of the Company and its affiliates, in a form satisfactory to the Company. Except as otherwise provided in this Section VI, the Executive shall have no further rights to any compensation or any other benefits under this Agreement following Termination.

SECTION VII
<u>OTHER DUTIES OF THE EXECUTIVE DURING AND AFTER THE PERIOD OF EMPLOYMENT</u>

a) <u>Cooperation</u>.

The Executive will, with reasonable notice during or after the Period of Employment, furnish information as may be in his possession and reasonably cooperate with the Company Group or its counsel as may reasonably be requested in connection with any claims or legal actions in which the Company Group is or may become a party.

b) <u>Confidential Information</u>.

1. <u>Obligation to Maintain Confidentiality</u>. The Executive acknowledges that the information, observations and data obtained by the Executive during the course of his performance of his duties for the Company, concerning the business and affairs of the Company Group are the property of the Company Group. Therefore, the Executive agrees that he will not disclose to any unauthorized Person or use for his own account any of such information, observations or data without the Company's written consent, unless and to the extent that such information, observations and data become generally known to and available for use by the public other than as a result of his acts or omissions to act. The Executive agrees to deliver to the Company on the date of Termination, or at any other time the Company may request in writing, all memoranda, notes, plans, records, reports, computer and electronic files and other documents in paper and electronic form (and copies thereof) relating to the business of the Company Group which he may then possess or have under his control.

2. <u>Ownership of Property</u>. The Executive acknowledges that all inventions, innovations, improvements, developments, methods, processes, programs, designs, analyses, drawings, reports, and all similar or related information (whether or not patentable) that relate to the Company Group's actual or anticipated business, research and development, or existing or future products or services and that are conceived, developed, contributed to, made, or reduced to practice by him (either solely or jointly with others) while employed by the Company (collectively, "**Work Product**"), in the course and scope of performing his duties hereunder, related to Company's products or business, belong to the Company Group and the Executive hereby assigns, and agrees to assign all of the above Work Product to the Company or its designee. Any copyrightable work prepared in whole or in part by the Executive in the course of his work for the Company shall be deemed a "work made for hire" under the copyright laws, and the Company Group shall own all rights therein. To the extent that any such copyrightable work is not a "work made for hire," the Executive hereby assigns and agrees to assign to the Company or its designee all right, title, and interest, including without limitation, copyright in and to such copyrightable work. The Executive shall promptly disclose such Work Product and copyrightable work to the Company and perform all actions reasonably requested by the Company (whether during or after the period of employment by the Company) to establish and confirm the Company Group's ownership (including, without limitation, assignments, consents, powers of attorney, and other instruments).

3. <u>Third Party Information</u>. The Executive understands that the Company Group will receive from third parties confidential or proprietary information ("**Third Party Information**") subject to a duty on the Company Group's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the Period of Employment and thereafter, the Executive will hold Third Party Information in the strictest confidence and will not disclose to anyone (other than personnel and authorized agents of the Company who need to know such information in connection with their work for the Company) or use, except in connection with the Executive's work for the Company, Third Party Information unless expressly authorized by the Company in writing.

4. **Exceptions to Confidential Information, Company Property and Third Party Information.** Notwithstanding anything in this Agreement or any agreement between the Executive and the Company to the contrary, confidential information, company property, and/or Third Party Information shall not include any information in the Executive's possession or known to the Executive prior to employment with the Company or any information that is generally known in the industry or in the public domain or becomes generally known in the industry or in the public domain through no wrongful act on the Executive's part, and the Executive may, without informing the Company prior to any such disclosure, disclose confidential information to a Federal, State, or local government official, solely for the purpose of reporting or investigating a suspected violation of law.

c) **Prior Employer Information.** As a condition of the Executive's continued employment by the Company, the Executive agrees that during the Period of Employment: (1) he shall not use or disclose to the Company any confidential information of any prior employer that is not publicly available; (2) to the extent that any prior employer of the Executive has an enforceable interest in restricting the Executive for a period of time from soliciting certain customers on behalf of the Company, or soliciting its employees to leave their current employment, the Executive shall honor any such obligations; and (3) the Executive shall not defame, disparage, or make negative statements about former employers.

d) **Representations and Warranties of the Executive.** The Executive makes the following representations and warranties: (1) the Executive has removed no documents or data from a prior employer or a third party and is in compliance and will remain in compliance with any obligations of confidentiality to any third parties; (2) the Executive has not entered into, and will not enter into, any agreement (whether written or oral) in conflict with this Agreement; (3) all information the Executive presented to the Company during the recruiting/hiring process, including without limitation pertaining to the Executive's qualifications, education, training, and prior work experience, was true and accurate; and (4) the Executive has at no time been and, to his knowledge, at no time shall be: (i) the subject of any inquiry or investigation, including without limitation subject to any subpoena issued by any state or federal governmental entity with respect to any health care fraud and abuse law, ordinance, regulation, or guideline; (ii) sanctioned within the meaning of Social Security Act Section 1128A or any amendments thereof; (iii) convicted of violating the federal Stark law, federal False Claims Act, federal anti-kickback statute, federal Health Insurance Portability and Accountability Act provisions, federal civil money penalties statute, or similar state laws; or (iv) debarred, excluded or suspended from participation in any federal or state health care program.

e) **Non-Competition/Non-Solicitation.** The Executive acknowledges that in the course of his employment with the Company, the Executive has and will become familiar with trade secrets and confidential information of the Company and the Company Group, that the Executive's services will be of special, unique, and extraordinary value to the Company, and that the Company Group would suffer immediate, material, and irreparable harm if the Executive were to engage in any Competitive Activity (as defined below) during the Period of Employment and/or during the Restricted Period (as defined below). Therefore, the Executive agrees that he shall not, unless otherwise set forth herein, engage in any Competitive Activity during the Period of Employment and/or during the Restricted Period, or any extension thereof as provided below.

7

1. <u>Competitive Activity</u>.  For purposes of this Agreement, "**Competitive Activity**" means, directly or indirectly, except in furtherance of the Executive's duties on behalf of the Company:

(a) performing any services (whether as an employee, consultant, independent contractor, advisor, or otherwise) that are the same or similar to the services the Executive performed in his role as CEO on behalf of the Company, on behalf of any Person engaged (or about to be engaged) in the manufacture, marketing and/or sale of spinal implants anywhere in the United States in which the Company Group manufactures, markets, and/or sells spinal implants;

(b) inducing or attempting to induce any Person who is employed by the Company Group during the Period of Employment to leave the employ of the Company Group and to accept other employment with or an offer to provide services to any other Person;

(c) inducing or attempting to induce any Person, including a customer, distributor, supplier, or business partner of the Company Group to cease or reduce such Person's business with the Company Group; or

(d) performing any services (whether as an employee, consultant, independent contractor, advisor, or otherwise), or participating in any manner (including as an investor), with any Person that is engaged (or is attempting to become engaged) in the then-existing business activities of the UNiD project, including, without limitation, the development, marketing, sales, and/or training of patient-specific implants used for spinal surgeries, including patient-specific implants used in cervical, lumbar, thoracic sacral or iliac spine procedures

(e) taking a Board seat in any company engaged (or about to be engaged) in the manufacture, marketing and/or sale of spinal implants anywhere in the world without any prior notice to and consent of the CEO of Medicrea International.

2. <u>Restricted Period</u>.  As used herein, "**Restricted Period**" means with respect to the Competitive Activities described in 1(a) – (e) above, a period of twelve (12) months following the Termination;

3. <u>Additional Definition</u>.  As used herein, (i) "**Person**" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, or an unincorporated organization.

4. <u>Extension of Restricted Period</u>.  If the Executive violates any of the terms of this Section, the Restricted Period shall be extended by a period of time equal to that period beginning when the activities constituting such violation commenced and ending when the activities constituting such violation terminated.

f) <u>Remedies</u>.  The Executive acknowledges and agrees that in the event that the Executive breaches or threatens to breach the provisions of this Section VII, the Company may,

8

in addition to any other rights and remedies existing in its favor, seek and obtain specific performance and/or injunctive or other relief in order to enforce, or to prevent any violations of, the provisions hereof, so long as the requirements for establishing the right to such relief are met by Company in accordance with applicable law.

g) <u>Blue Pencil</u>. If, at the time of enforcement of this Section VII of this Agreement, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the maximum duration or scope reasonable under such circumstances shall be substituted for the stated period, scope, or area, and that the court shall be allowed to revise the restrictions contained herein to cover the maximum duration, scope, and area permitted by law.

## SECTION VIII
## TAXES

a) <u>Withholding</u>. The Company may directly or indirectly withhold from any payments under this Agreement all federal, state, city or other taxes or payments that are required to be withheld pursuant to any law or governmental regulation, and any other payments approved in writing by the Executive.

b) <u>Additional Provisions Relating to Section 409A</u>. This Agreement is intended to comply with or be exempt from Internal Revenue Code Section 409A and the regulations and guidance promulgated thereunder (collectively, "Section 409A") and accordingly, to the maximum extent permitted, this Agreement and the terms therein shall be interpreted to be in compliance with or exempt from Section 409A. To the extent any reimbursements or in-kind benefits under this Agreement constitute non-qualified deferred compensation for purposes of Section 409A, (i) all such expenses or other reimbursements under this Agreement shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by the Executive, (ii) any right to such reimbursement or in kind benefits is not subject to liquidation or exchange for another benefit and (iii) no such reimbursement, expenses eligible for reimbursement or in-kind benefits provided in any taxable year shall in any way affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year. In the event that the Executive is deemed to be a specified employee of a public company for purposes of Section 409A at the time of the Executive's Termination, then any amounts that are subject to Section 409A and that become payable upon a separation from service shall not be paid before the six-month anniversary of such separation from service or, if earlier, the Executive's death. The Executive's right to receive any installment payment pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments. The parties agree to amend this Agreement, where practicable, to bring this Agreement into compliance with Section 409A, provided that any such amendment shall preserve the intended economics of this Agreement to the maximum extent practicable. Notwithstanding anything to the contrary in this Agreement, the Company makes no guarantee as to any particular tax effect.

## SECTION IX
## CONSOLIDATION, MERGER OR SALE OF ASSETS

Nothing in this Agreement shall preclude the Company from consolidating or merging into or with, or transferring all or substantially all of its assets to, another company or entity which assumes this Agreement and all obligations and undertakings of the Company hereunder. Upon such a consolidation, merger or sale of assets, the term "the Company" as used will mean the other company or entity and this Agreement shall continue in full force and effect.

## SECTION X
## GOVERNING LAW; ARBITRATION

Except as provided below in this Section X, this Agreement shall be governed by and construed under the laws of the State of New York, without regard to its conflict of laws principles.

In the event of any dispute arising out of or relating to this Agreement or the Executive's employment with the Company, the parties agree first to engage in prompt and serious good faith discussions to resolve the dispute. If such discussions fail to resolve the dispute within 30 days, the parties shall try to resolve the dispute through mediation using the services of JAMS. If such mediation fails to resolve the dispute, then any such dispute among the parties hereto shall be settled by final and binding arbitration before a single arbitrator in New York, New York in accordance with the rules then obtaining of the American Arbitration Association (the "*AAA*") and judgment upon the award rendered may be entered in any court having jurisdiction thereof. Such arbitration shall be conducted in accordance with the AAA's then-existing Employment Arbitration Rules, with the following exceptions if in conflict: (a) the arbitrator shall be chosen by the parties, provided, however, that to the extent the parties are unable to agree on arbitrator, then the AAA shall select the arbitrator, who shall be a retired federal court judge and (b) each party to the arbitration will pay one-half of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator. Each party shall bear its own attorneys' fees and expenses; provided that the arbitrators may assess the prevailing party's reasonable attorneys' fees and costs against the non-prevailing party as part of the arbitrators' award. The parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrators shall be final and conclusive. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action in any court of competent jurisdiction for injunctive relief or specific performance as provided in this Agreement. This dispute resolution process and any arbitration hereunder shall be confidential and neither any party nor the neutral mediator(s) and/or arbitrators shall disclose the existence, contents or results of such process without the prior written consent of all parties, except where necessary or compelled in a court to enforce this arbitration provision or an award from such arbitration or otherwise in a legal proceeding. This agreement to arbitrate shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.*

## SECTION XI
## MISCELLANEOUS

a)      Notices. All notices, requests, consents and other communications hereunder shall

10



Case 1:21-cv-02908-ER   Document 1-8   Filed 04/05/21   Page 14 of 15

be in writing and shall be deemed to have been made when delivered or mailed first-class postage prepaid by registered mail, return receipt requested, or when delivered if by hand, overnight delivery service or confirmed facsimile transmission, to such address as may have been furnished by one party to the other party in writing.

    b)    <u>Modification</u>. This Agreement may not be modified or amended except in writing signed by the parties. No waiver by either of the parties hereto of their rights hereunder shall be deemed to constitute a waiver with respect to any subsequent occurrences or transactions hereunder unless such waiver specifically states that it is to be construed as a continuing waiver.

    c)    <u>Survival</u>. The provisions of <u>Section VII</u> through <u>Section XI</u> of this Agreement (together with any related definitions) shall survive any termination of this Agreement.

    d)    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which will be an original, and all of which will be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission will have the same legal effect as delivery of an original signed copy of this Agreement.

    e)    <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of the Company and its respective successors and assigns. In addition to any obligations imposed by law upon any successor to the Company, the Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. The Executive's rights and obligations under this Agreement shall not be transferable by the Executive by assignment or otherwise, without the prior written consent of the Company; provided, however, that if the Executive dies, all amounts then payable to the Executive hereunder shall be paid in accordance with the terms of this Agreement to the Executive's devisee, legatee, or other designee, or if there be no such designee, to the Executive's estate.

    f)    <u>Entire Agreement</u>. This Agreement constitutes the entire understanding and agreement of the parties hereto regarding the employment of the Executive. This Agreement supersedes all prior negotiations, discussions, correspondence, communications, understandings, and agreements between the parties relating to the subject matter of this Agreement, including, for avoidance of doubt, the Executive's September 11, 2017 employment agreement with the Company.

    g)    <u>Severability</u>. Every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity will not affect the validity or legality of the remainder of this Agreement.

[Signature page follows]

11

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

**MEDICREA USA, CORP.**

By: _____

Name: _____

Title: _____


**EXECUTIVE:**

_____  07/30/18
JOSEPH WALLAND