GREENBERG TRAURIG LLP
James W. Perkins
Eric Sigda
Adam Kirschbaum
Met Life Building
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-9200
perkinsj@gtlaw.com
sigdae@gtlaw.com
kirschbauma@gtlaw.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEDTRONIC, INC., MEDTRONIC SOFAMOR DANEK, INC., MEDTRONIC SOFAMOR DANEK USA, INC., AND MEDICREA USA, CORP., <br><br> Plaintiffs, <br><br> -against- <br><br> JOSEPH F. WALLAND, JR., <br><br> Defendant. | CASE NO. 1:21-CV-02908 (EG) (OTW) |

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**<u>TABLE OF CONTENTS</u>**

Page(s)

TABLE OF AUTHORITIES ................................................................ iii, iv

INTRODUCTION ...........................................................................1

BACKGROUND ...........................................................................2

I.      The Parties.........................................................................2

II.     Walland's Employment Agreement as Medicrea's New York-Based CEO .....................3

        A.      Relocation Provision ................................................................3

        B.      "Change of Control" Provision.........................................................3

        C.      Restrictive Covenants................................................................3

        D.      Dispute Resolution Provisions........................................................4

        E.      Survival and Assignment Provisions ...................................................5

III.    Walland's Separation Agreement....................................................5

IV.     Walland's Knowledge of Medicrea's Trade Secrets and Confidential Information...........7

V.      EOS and Alphatec Are Direct Competitors of Medicrea ................................10

VI.     Walland's "Competitive Activity" in Breach of His Restrictive Covenants ...................12

ARGUMENT ...........................................................................14

I.      Plaintiffs Will Suffer Irreparable Harm if Walland Is Not Enjoined from Violating His Noncompete Obligations ................................................................16

II.     Medtronic Is Likely to Succeed on the Merits of its Claims ...........................18

        A.      Section X's Dispute Resolution Procedures Are Valid and Enforceable ............18

        B.      Walland's Restrictive Covenants Are Valid and Enforceable ............................19

                1.      The Duration and Scope of the Walland's Restrictions are Reasonable ............................................................20

2.      Walland's Restrictions Serve to Protect Plaintiffs' Legitimate
Business Interests ...................................................................................21

C.      California Law Does Not Govern Walland's Restrictive Covenants ...................23

III.    The Balance of Equities Favors Temporary Injunctive Relief Against Walland..............23

IV.     The Public Interest Favors the Enforcement of Contractual Agreements. .......................24

CONCLUSION...................................................................................................................25

## TABLE OF AUTHORITIES

Cases                                                                                                                    Page(s)

*Almontaser v. N.Y.C. Dep't of Educ.*,
  519 F.3d 505 (2d Cir. 2008) ........................................................................................15

*Am. Exp. Fin. Advisors Inc. v. Thorley*,
  147 F.3d 229 (2d Cir. 1998) ........................................................................................15

*Ayco Co. v. Frisch*,
  795 F. Supp. 2d 193 (N.D.N.Y. 2011) ...................................................................17, 24

*Basank v. Decker*,
  449 F. Supp. 3d 205 (S.D.N.Y. 2020) ...................................................................15, 24

*BDO Seidman v. Hirshberg*,
  712 N.E.2d 1220 (N.Y. 1999) .....................................................................................20

*Brenntag Int'l Chems., Inc. v. Bank of India*,
  175 F.3d 245 (2d Cir. 1999) ........................................................................................16

*Broker Genius, Inc. v. Volpone*,
  313 F. Supp.3d 484 (S.D.N.Y. 2018) ..........................................................................18

*Capstone Logistics Holdings, Inc. v. Navarrete*,
  No. 17-CV-4819 (GBD), 2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018) ...................16, 17, 24

*Chernoff Diamond & Co. v. Fitzmaurice, Inc.*,
  651 N.Y.S.2d 504 (N.Y. App. Div. 1996) ...................................................................20

*Convergen Energy LLC v. Brooks*,
  No. 20-CV-3746 (LJL), 2020 WL 5549039 (S.D.N.Y. Sept. 16, 2020) ......................15

*Dean Witter Reynolds, Inc. v. Byrd*,
  470 U.S. 213 (1985) .....................................................................................................18

*General Mills, Inc. v. Champion Petfoods USA, Inc.*,
  No. 20-CV-181, 2020 WL 915824 (Feb. 26, 2020) ................................................15, 17

*Gold v. Deutsche Aktiengesellschaft*,
  365 F.3d 144 (2d Cir. 2004) ........................................................................................19

*Int'l Bus. Machs. Corp. v. Lima*,
  No. 7:20-CV-04573 (PMH), 2020 WL 5261336 (S.D.N.Y. Sept. 3, 2020).................passim

*Lebovits v. Cavalry Portfolio Servs., LLC*,
   No. 20-CV-01116 (KMK), 2021 WL 1198967 (S.D.N.Y. March 29, 2021)..........................19

*Marsh USA Inc. v. Schuhriemen*,
   183 F. Supp. 3d 529 (S.D.N.Y. 2016)...........................................................................17, 18

*Mercer Health & Benefits LLC v. DiGregorio*,
   307 F. Supp. 3d 326 (S.D.N.Y. 2018)...............................................................16, 17, 18, 20

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985).........................................................................................................18

*Morelli v. Alters*,
   No. 1:19-CV-10707-GHW, 2020 WL 1285513 (S.D.N.Y. Mar. 18, 2020)...........................18

*Nunez v. Citibank, N.A.*,
   No. 08CV5398 (BSJ), 2009 WL 256107 (S.D.N.Y. Feb. 3, 2009) ........................................18

*Oliver Wyman, Inc. v. Eielson*,
   282 F. Supp. 3d 684 (S.D.N.Y. 2017)..............................................................................21

*Sulzer Mixpac AG v. DXM Co.*,
   No. 19 CIV. 9404 (LAP), 2020 WL 3619047 (S.D.N.Y. July 2, 2020) .................................16

*Ticor Title Ins. Co. v. Cohen*,
   173 F.3d 63 (2d Cir. 1999) ........................................................................................18, 20

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*,
   339 F.3d 101 (2d Cir. 2003) ............................................................................................16

## **Rules**

Federal Rule of Civil Procedure 65..............................................................................................2

## **Statutes**

The Federal Arbitration Act, 9 U.S.C. §§ 1, et seq.....................................................................18

Cal. Bus. & Prof. Code § 16600 ...............................................................................................23

## **INTRODUCTION**

This is an application to halt the imminent irreparable harm Plaintiffs will suffer if Defendant Joseph F. Walland, Jr. ("Walland") is permitted to continue violating the noncompete and nondisclosure covenants he signed as chief executive officer of Plaintiff Medicrea USA, Corp. ("Medicrea"). In breach of his restrictions, Walland has accepted employment with one of Medicrea's direct competitors and has assumed a role that will assist that company and its affiliates in their efforts to unfairly compete with Plaintiffs in the spinal implant industry.

Walland served as the New York-based CEO of Medicrea from summer 2018 until November 2020, when Medicrea was acquired by Plaintiff Medtronic, Inc. ("Medtronic"). Approximately one month after the acquisition, Walland voluntarily terminated his employment. On April 5, 2021, Plaintiffs were informed that Walland was now working as the Vice President of Sales Channel Development for Alphatec Spine, Inc, a subsidiary of Alphatec Holdings, Inc. (together with Alphatec Spine, Inc., "Alphatec").

Pursuant to his Employment Agreement with Medicrea, Walland is party to a suite of restrictive covenants, including a one-year noncompete that is directly implicated by his new role at Alphatec. By the terms of his Employment Agreement, these covenants—along with the remedies available to Medicrea in the event of breach—survive the termination of Walland's employment. This point is further emphasized in the Separation Agreement and Release that Walland signed in connection with his voluntary termination. In this agreement, Walland promised Medtronic (along with its subsidiaries and affiliates, including Medicrea) that he would abide by the restrictive covenants in his Employment Agreement, and he received an additional $50,000 from Medtronic specifically for this promise.

Because Walland has not kept his promise, Plaintiffs have invoked the alternative dispute resolution procedures of the Employment Agreement, which require mediation under the auspices

of JAMS and, if mediation fails to resolve the dispute, arbitration in New York under the rules of the American Arbitration Association. Plaintiffs bring this action to compel Walland to engage in mediation and arbitration as required by the Employment Agreement, as well as to enjoin him during the pendency of mediation and arbitration from continuing to violate his restrictive covenants by engaging in prohibited activities on behalf of Alphatec and EOS Imaging, Inc. ("EOS"), a company with which Alphatec is currently in the process of merging.

This memorandum is submitted in support of Plaintiffs' motion for temporary restraining order and preliminary injunction pursuant to Fed. R. Civ. P. 65. This relief is needed to preserve the status quo pending the agreed mechanisms for dispute resolution and to prevent the irreparable harm Plaintiffs will suffer if Walland is permitted to continue violating his restrictive covenants.

## BACKGROUND

### I.      The Parties

Plaintiff Medtronic is a global healthcare solutions company. Plaintiff Medicrea, a wholly owned indirect subsidiary of Medtronic since on or around November 13, 2020, specializes in the design, integrated manufacture, and distribution of spinal implant technologies. (Declaration of Dan Wolf ("Wolf Decl.") ¶¶ 7, 11.)

Until a few months ago, Defendant Walland was Medicrea's CEO. (*Id.* ¶ 8.) Following Medtronic's acquisition of Medicrea, Walland voluntarily terminated his employment. (*Id.*) In a letter dated April 5, 2021, Alphatec informed Plaintiffs that Walland was now serving as Alphatec's Vice President of Sales Channel Development and asserted that Walland is not bound by the promises he made in his agreements with Plaintiffs. (*Id.* Ex. I.)

## II.     Walland's Employment Agreement as Medicrea's New York-Based CEO

Medicrea and Walland entered into an Employment Agreement, effective July 1, 2018. (*Id.* Ex. A.) Pursuant to that agreement, Walland agreed to serve as Medicrea's CEO and to undertake such duties and responsibilities as were specified therein, including but not limited to "the typical management responsibilities expected of an individual holding such position, and such other responsibilities as may be reasonably assigned to [Walland] from time to time." (*Id.* § II.)

### A.     Relocation Provision

Pursuant to Section IV(e), Walland agreed that "he shall relocate from California to New York by no later than December 31, 2018," and Medicrea agreed to pay his relocation expenses. (*Id.*) By January 2019, Walland resided in New York and worked at Medicrea's New York office. Medicrea withheld New York state income taxes from his paycheck from at least January 2019 to July 2020. (Declaration of Grace Cargill ("Cargill Decl.") ¶¶ 9-10.) Though still based in the New York office, Walland temporarily relocated to California during the COVID-19 pandemic.

### B.     "Change of Control" Provision

Section VI(d) provides that if Walland "decides to terminate his employment before July 1, 2021 as a result of (and within six months of) a Change of Control, then in addition to the Accrued Obligations, [Walland] shall be entitled to receive" certain compensation as specified therein. (Wolf Decl. Ex. A.) Following Medtronic's acquisition of Medicrea, Walland exercised his right to terminate his employment pursuant to Section VI(d). (*Id.*)

### C.     Restrictive Covenants

Section VII places various restrictions on Walland's competitive activities following his employment with Medicrea. Section VII(b) requires Walland to maintain the confidentiality of the information, observations, and data he obtained concerning the business and affairs of Medicrea. (*Id.*) Pursuant to Section VII(e), Walland agreed that he would not "engage in any Competitive

3

Activity" for a period of twelve months after his employment with Medicrea terminated. (*Id.*)

Section VII(e)(1)(a) defines the term "Competitive Activity" to mean

> [P]erforming any services (whether as an employee, consultant, independent contractor, advisor or otherwise) that are the same or similar to the services [Walland] performed in his role as CEO on behalf of [Medicrea], on behalf of any Person engaged (or about to be engaged) in the manufacture, marketing and/or sale of spinal implants anywhere in the United States in which the Company Group manufactures, markets, and/or sells spinal implants.

(*Id.*) Section VII(e)(1)(d) also defines the term "Competitive Activity" to mean

> [P]erforming any services (whether as an employee, consultant, independent contractor, advisor or otherwise), or participating in any manner (including as an investor), with any Person that is engaged (or is attempting to become engaged) in the then-existing business activities of the UNiD project, including, without limitation, the development, marketing, sales, and/or training of patient-specific implants used for spinal surgeries, including patient-specific implants used in cervical, lumbar, thoracic, sacral or iliac spine procedures.

(*Id.*)

### D.    Dispute Resolution Provisions

Section VII(f) provides Medicrea with rights and remedies—including the right to seek injunctive relief—in the event Walland breaches his Employment Agreement:

> The Executive acknowledges and agrees that in the event that the Executive breaches or threatens to breach the provisions of this Section VII, [Medicrea] may, in addition to any other rights and remedies existing in its favor, seek and obtain specific performance and/or injunctive or other relief in order to enforce, or to prevent any violations of the provisions hereof, so long as the requirements for establishing the right to such relief are met by the Company in accordance with applicable law.

(*Id.*)

Section X provides that "[e]xcept as provided below in this Section X, this Agreement shall be governed by and construed under the laws of the State of New York, without regard to its

4

conflict of laws principles." (*Id.*) Section X contains a three-step dispute resolution provision that requires the parties to meet and confer, then engage in mediation, and if mediation fails, to then engage in arbitration in New York. However, Section X also provides that "nothing in this subsection shall be construed as precluding the bringing [sic] an action in any court of competent jurisdiction for injunctive relief or specific performance as provided in this Agreement." (*Id.*)

###    E.    Survival and Assignment Provisions

Section XI(c) provides that "[t]he provisions of Section VII through Section XI of [the Employment] Agreement (together with any related definitions) shall survive any termination of this Agreement." (*Id.*) Section XI(e) of the Employment Agreement provides that

> [t]his Agreement shall inure to the benefit of [Medicrea] and its respective successors and assigns. In addition to any obligations imposed by law upon any successor to [Medicrea], [Medicrea] shall require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of [Medicrea] to expressly assume and agree to perform this Agreement in the same manner and to the same extent that [Medicrea] would be required to perform it if no such succession had taken place.

(*Id.*)

## III.    Walland's Separation Agreement

On or about November 13, 2020, Medtronic acquired complete ownership and control of the capital and business (including goodwill, trade secrets, and other confidential and proprietary business information) of Medicrea. (*Id.* Ex. B.) Walland was offered a post-acquisition position at Medtronic; however, he declined that offer and notified Plaintiffs that he would be voluntarily terminating his employment. (Cargill Decl. ¶ 2.)

Medtronic and Walland agreed that Medtronic's acquisition of Medicrea constituted a "Change of Control" as defined in Employment Agreement, and further agreed to provide for termination of Walland's employment relationship with Medtronic (including any affiliate or

subsidiary of Medtronic) and all agreements *except* the Employment Agreement. (Wolf Decl. ¶ 10.) Medtronic and Walland negotiated at arms-length regarding his termination. (*Id.*.) During the negotiations, Walland objected that the severance amount provided in the Employment Agreement would be insufficient to support his needs while he searched for new employment, specifically pointing to the additional time he anticipated it would take to find new employment given his restrictive covenants. (Cargill Decl. ¶ 3.) Therefore, Walland requested more severance compensation than that to which he was entitled under the Employment Agreement. (*Id.*) Medtronic offered to pay an additional $50,000 as consideration for Walland reaffirming that he would abide by the restrictive covenants in the Employment Agreement. Walland accepted Medtronic's offer, and on or about January 7, 2021, Medtronic and Walland entered into a Separation Agreement and Release ("Separation Agreement") reflecting the negotiated terms upon which they had agreed. (*Id.* ¶¶ 4-7.)

The opening paragraph of the Separation Agreement provides that it is made by Medtronic "on behalf of itself and any affiliate or subsidiary company, including Medicrea USA, Corp., that is the common law employer of Walland (collectively, 'Medtronic')." (*Id.* Ex. B.) Accordingly, Medtronic Sofamor Danek, Inc., Medtronic Sofamor Danek USA, Inc., and Medicrea are all intended third party beneficiaries of the Separation Agreement. (*Id.*)

Pursuant to Article 1.1 of the Separation Agreement, termination of Walland's employment with Medtronic (including any affiliate or subsidiary thereof) was effective on December 10, 2020. (*Id.*) Walland received $82,500 in severance payments tied to the Change of Control provisions in the Employment Agreement and the $50,000 Medtronic agreed to pay "[a]s additional consideration for the terms and provisions of this [Separation] Agreement." (*Id.*)

Article 3 of the Separation Agreement is entitled "Release." Article 3.1 provides in pertinent part that:

> Walland waives and releases any claim that the restrictions in Section VII of the Medicrea Employment Agreement are not reasonable and enforceable as written, and acknowledges that these post-employment restrictions (concerning, for example, Confidential Information, Non-competition, and Non-solicitation obligations entered into and to be enforced pursuant to New York law) shall survive this Release and remain in effect in accordance with their terms (hereafter referred to as the "Surviving Protective Covenants").

(*Id.*)[1] Article 4.1 of the Separation Agreement provides in pertinent part that "Medtronic shall retain and be entitled to enforce the Surviving Protective Covenants for the benefit of itself and any affiliates, successors and assigns." (*Id.*) Article 4.2 provides in pertinent part:

> A material purpose of this Agreement is to avoid disputes over the enforceability of the Surviving Protective Covenants as written and to ensure Walland's compliance with them. Medtronic's agreement to pay Walland the full amount provided for in Section 2.2, and Walland's agreement not to contest the enforceability of the Surviving Protective Covenants are mutually dependent items of consideration.

(*Id.*)[2]

## IV.   Walland's Knowledge of Medicrea's Trade Secrets and Confidential Information

Medicrea is in the business of selling implants and software-based services for use in spinal

---

[1] Article 4.8 also provides that "*[e]xcept as otherwise expressly indicated with respect to the Surviving Protective Covenants*, [the Separation] Agreement shall be governed by the laws of the State of California, without respect to conflict of laws principles." (*Id.* (emphasis added).)

[2] Article 3.1 of the Separation Agreement further provides that "Walland acknowledges that this Release specifically covers, but is not limited to, any and all claims, complaints, causes of actions or demands . . . which he has or may have against Medtronic relating in any way to . . . violation of the California Labor Code[,] California Government Code or California Business and Professions Code (including, without limitation, Section 17200 thereof or any unfair business practices claims) or any other theory or basis, whether legal or equitable." (*Id.*)

fusion procedures. (*Id.* ¶ 11.) Its twenty-year-old business competes in three technology categories: traditional spinal implants, patient specific spinal implants, and image processing services. (*Id.*) The image processing services uses patient imaging (*e.g.*, x-ray) and measurement software called the UNiD analyzer, a device cleared by the FDA via its 510k procedures, to make measurements and create surgical plans. (*Id.*) The surgical plan is an input to the patient specific implant that is custom manufactured on-demand. The patient specific implant is used with traditional spinal implants in a fusion procedure. (*Id.*) Not all Medicrea procedures use patient specific implants, but all Medicrea procedures that use patient specific implants also use traditional implants. (*Id.*)

As Medicrea's CEO, Walland had significant involvement across Medicrea's operations and sales functions and gained extensive knowledge of Medicrea's trades secrets and confidential information. He had nine direct reports, including the chief commercial officer (who was responsible for Medicrea's sales and sales operations); the marketing manager; the clinical manager; the UNiD lab manager; the IT manager; the training manager; the human resources generalist; and the regulatory and quality assurance manager. (*Id.* ¶ 12.) He created and implemented strategic decisions related to Medicrea's U.S. operations and participated in worldwide organizational strategic decisions as part of the executive leadership team. (*Id.* ¶ 14.) He also devoted significant time toward driving Medicrea's U.S. revenue, playing a key role in sales and marketing activities, including direct contact with distributors and surgeons. (*Id.*) Additionally, Walland had access to Medicrea's business model and software platforms, including the trade secret algorithms used with Medicrea's UNiD software platform. (*Id.* ¶ 38.)

During Medtronic's due diligence in connection with the Medicrea acquisition, Walland was Medtronic's primary U.S. point of contact. (*Id.* ¶ 17.) He was also Medtronic's primary U.S. contact for integration planning and post-closing integration of Medicrea's business into

Medtronic. (*Id.*) His work with Medtronic before and after the acquisition provided Walland access to all confidential strategic plans related to Medicrea, including its research and development pipelines, as well as Medtronic's U.S. sales strategies and distributor integration plans. (*Id.*)

Following the acquisition in November 2020, Walland served as the U.S. sales leader for Medicrea directly responsible for distributor management, U.S. sales revenue, and implementation of confidential commercial strategies (including one regarding the attachment of an annual UNiD planning service to capital sales). (*Id.*) He likewise continued to have responsibilities relating to Medicrea's pricing, commercial and competitive strategies (including but not limited to account segmentation; customer targeting and engagement; sales rep compensation plan design; and distributor management and communications), and integration strategies. (*Id.* ¶15.)

During this period, Walland reported jointly to Dan Wolf (Medtronic VP, Business and Strategy, Cranial and Spinal Technologies; President and General Director for Medicrea International SA; Vice President and Officer of Medicrea) and Roy Galvin (Medtronic VP, Cranial and Spine Technologies U.S. Sales). (*Id.* ¶ 15.) Walland participated in many meetings with Galvin, Wolf, and members of Wolf's staff, at which confidential information and plans regarding the integration of Medicrea into Medtronic were discussed. (*Id.* ¶ 16.) Wolf spoke to him one-on-one at least once (but often several times) each week. (*Id.*) Subjects discussed included pricing strategies, marketing plans, and strategies regarding termination or retention of distributors and employees. (*Id.*) Walland also participated in the design of compensation strategies for distributors and regional directors. (*Id.*) He also participated in Galvin's U.S. management meeting to present on strategy and distributor plans to approximately eight regional vice presidents. (*Id.*)

Walland also personally introduced Wolf to numerous Medicrea surgeon customers and provided Wolf with background information on these surgeons, including their practice

composition, biography, and experience with other competitors. (*Id.*) In their one-on-one conversations, Walland and Wolf frequently, if not always, discussed individual customer-specific topics (*e.g.*, the importance of an individual Medicrea distributor representative relationship with a specific surgeon; the potential business impact to Medicrea of terminating a distributor and transferring the account to a Medtronic representative). (*Id.*)

Both Medtronic and Medicrea use reasonable efforts to protect the secrecy of their trade secrets and confidential information, including by using restrictive covenants and restricting access to trade secrets and confidential information through use of passwords and other means. (*Id.* ¶ 18.)

## V.   EOS and Alphatec Are Direct Competitors of Medicrea

According to its website, EOS "is a global medical device company that provides innovative, low dose 2D/3D imaging and software solutions" and designs "unique imaging systems and Advanced Orthopedic Solutions (AOS) to collectively bridge the entire spectrum of care, from imaging to surgical planning and post-operative assessment capabilities for orthopedic surgery." (*Id.* ¶ 20.) EOS is in the business of selling capital and software-based services to create full body x-rays and plans for spinal and orthopedic procedures. (*Id.* ¶ 21.) The EOS imaging system generates a high quality x-ray used primarily for spinal deformity assessment. (*Id.*) The EOS stereos software uses the EOS imaging system or other images (*e.g.*, x-ray) to make measurements and alignment assessment plans for spinal fusion surgery. (*Id.*) EOS's stereos software, like Medicrea's UNiD analyzer, uses EOS imaging system or other images to make measurements and alignment assessments for spinal patients. (*Id.*) EOS software systems are direct substitutes for the creation of spinal alignment measurements, and Medicrea's UNiD analyzer uses EOS images or x-rays to create surgical plans. (*Id.*)

According to its S-3 Registration Statement filed with the SEC last month, Alphatec is

a medical technology company focused on the design, development, and advancement of technology for better surgical treatment of spinal disorders. Through our wholly owned subsidiaries, Alphatec Spine, Inc. and SafeOp Surgical, Inc., our mission is to revolutionize the approach to spine surgery through clinical distinction. We are focused on developing new approaches that integrate seamlessly with the Alpha InformatiXTM System to provide real-time, objective nerve information that can enhance the safety and reproducibility of spine surgery."

(*Id.* ¶ 22.) Alphatec is in the business of selling implants and instruments for use in spinal fusion procedures. (*Id.* ¶ 23.) Two of Alphatec's significant product lines are Invictus and Arsenal, which are traditional spinal implant systems. (*Id.*) These systems are direct competitive substitutes for Medicrea's largest product line by revenue, the PASS LP screw system. (*Id.*) Medicrea's PASS LP and the Invictus/Arsenal systems have nearly identical FDA clearances. (*Id.*)

On or about December 17, 2020, Alphatec and the French parent of EOS announced that they had entered into a "new agreement between the two companies whereby Alphatec Holdings is to acquire EOS via a cash tender offer." (*Id.* ¶ 24.) Their press release states that the combination of Alphatec and EOS will "[f]acilitate patient specific implants" and "pre-surgical planning that improves inventory efficiency."[3] (*Id.* ¶ 25.) The "patient specific implants" referenced are directly competitive with Medicrea's UNiD business. (*Id.*) The "pre-surgical planning that improves inventory efficiency" referenced is directly competitive with a confidential Medicrea project as to which Walland was privy to Medicrea's trade secrets and confidential information. (*Id.*)

There is no basis upon which to dispute that EOS and Alphatec are direct competitors of Medicrea. EOS directly competes with Medicrea's software business with EOS stereos. (*Id.* ¶ 26.) Alphatec directly competes with Medicrea's traditional implant business with Invictus and

---

[3] This acquisition announcement was made one week after Walland informed Plaintiffs that he would be voluntarily terminating his employment.

Arsenal. (*Id.*) The combined companies will compete with Medicrea's patient specific implant business. (*Id.*) Indeed, Alphatec has touted the benefits of its proposed acquisition of EOS, describing how the combination of these companies will bring a product to market that will directly compete with Medicrea's UNiD product offering. (*Id.* ¶ 27, Ex. C.)

## VI.    Walland's "Competitive Activity" in Breach of His Restrictive Covenants

At some point, as yet unknown to Plaintiffs, after terminating his employment with Medicrea, Walland began to engage in "Competitive Activity" on behalf of Alphatec and EOS in violation of his restrictive covenants.

On or about March 30, 2021, an email was received in Walland's former Medicrea email account (which in accordance with Medtronic practice was forwarded to a Medtronic employee for review). (Declaration of Nicholas Benson ("Benson Decl.") ¶ 15, Ex. B.) The email was sent by Mike Lobinsky, EOS's CEO, and directed to Walland, along with Eric Dasso and David Sponsel, who are respectively Alphatec's Executive Vice President of Adjunctive Technologies and Alphatec's Executive Vice President of Sales. (*Id.*) The email reads: "Please see attached 2021 EOS Capital RSM Comp plans for reference. We have 2 RSM's at a quota of 7 and other (new to EOS – started 2 weeks ago) with a quota of 6. Looking forward to building these out further as a combined business." (*Id.*) Attached to the email were two Excel spreadsheets. (*Id.* ¶ Exs. C-D.)

On the following day, March 31, 2021, Lobinsky sent a second email to Walland, Dasso, and Sponsel.[4] (*Id.* ¶¶ 16-17, Ex. E.) The email reads:

> **From:** Mike LOBINSKY
> **Date:** Wednesday, March 31, 2021 at 12:11 PM
> **To:** Eric Dasso , Joe Walland , David Sponsel
> **Subject:** [EXTERNAL] April 12th QPR - EOS Planning
> **Resent-From:** Joe Walland
> **Resent-Date:** Wednesday, March 31, 2021 at 12:11 PM

---

[4] Medtronic advised Lobinsky that he was sending emails to an @medicrea.com account.

Eric, Dave and Joe – Good spending the time together this week. As a follow up to yesterday's meeting and as we prepare for your upcoming QPR I have put together the bullet points below which were identified as "what to cover" with your sales leadership during our time on the 12th of April.

**EOS:**
1.      Deal highlights – Why is ATEC acquiring EOS / deal rationale – Dasso
2.      EOS overview:
a.      Company History and install base growth over time – Mike
b.      Portfolio (EOS, EOSedge and AOS) – Graham / Dana
c.      Profile of the ideal EOS target (surgeon, facility) – Graham
d.      How is EOS different than other modalities – what happens today and why is EOS solution so much better:
i.      Clinical (Patient, Surgeon, Facility) benefits – Dana
ii.      Strategic benefits – Marketing, market development, workflow efficiencies, program growth examples – Aaron
iii.      Financial rationale (ROI Examples) – Graham
d.      High level process overview (order to install today) – EW
3.      Sales Alignment and what is required today as well as expectations to come, What to do with leads today – Dave / Joe
4.      Draft Comp Structure – Dave / Joe
5.      Value prop today and plan for future – Dasso
6.      Timelines and what's to come – Dasso, Dave, Joe
7.      Q&A

It would be great if you could confirm the above captures what we are looking to cover in this first session and that I am not missing anything. We will assemble the presentation and will share with you early next week for initial review.

Is it also possible to schedule the time of the EOS section for mid-afternoon to allow for Monday morning travel in? If not conducive I will have those flying in arrive on Sunday night.

Thx,

(*Id.*)

The foregoing emails indicate that Walland is taking part in strategic conversations, detailed strategic planning to merge the two companies, and the acceleration of EOS and Alphatec acting as one integrated and coordinated organization. (*Id.* ¶ 18 Exs. B-E.) They also indicate that

Walland is acting, or planning to act, as a sales leader for Alphatec, EOS, or the combined companies with responsibilities for U.S. sales, and that he will participate in a "QPR" meeting on April 12, 2021, where he will be presenting regarding compensation structure, what to do with leads, and "sales alignment." (*Id.*) One of the Excel spreadsheets sent by Lobinsky contains information that appears to have been derived from confidential Medicrea information of which Walland had knowledge. (*Id.* ¶ 18.)

Based upon the foregoing, and on information and belief, Walland has engaged, and will continue to engage unless enjoined, in "Competitive Activity" in violation of his Employment and Separation Agreements by performing services for Alphatec and EOS, both of which are direct competitors of Medicrea. (*Id.* ¶¶ 19-20.) By letter dated April 2, 2021, Plaintiffs demanded that Walland stop violating his noncompete obligations and provide written confirmation that he has ceased and desisted from performing such activities. (Wolf Decl. Ex. H.)

On April 5, 2021, Jason C. Hamilton, Director, Legal Affairs & Litigation, at Alphatec, responded to Plaintiffs' cease-and-desist letter. (*Id.* Ex. I.) Mr. Hamilton's letter denied that Walland was in violation of his agreements with Plaintiffs, while at the same time admitting (a) that Walland is working as Alphatec's Vice President of Sales Channel Development; and (b) that Walland is involved with Alphatec's acquisition of EOS as it relates to the "potential alignment of EOS' sales of the physical imaging systems – the capital equipment itself – with ATEC's existing business." (*Id.*) The letter made clear that Walland would not cease engaging in the activities which are clearly in violation of his restrictive covenants. (*Id.*)

## <u>ARGUMENT</u>

### INJUNCTIVE RELIEF IS NECESSARY AND APPROPRIATE TO PRESERVE THE STATUS QUO AND PREVENT IRREPARABLE HARM PENDING MEDIATION AND ARBITRATION

To remedy the harm caused by Walland's misconduct, Plaintiffs have triggered the dispute

resolution procedures contained in Section X of the Employment Agreement, which call for mediation and then binding arbitration, should mediation prove unsuccessful. Because these procedures necessarily take time to complete, Section X authorizes Plaintiffs to seek injunctive relief in the interim to preserve the status quo and prevent further irreparable harm.

This contractual right is buttressed by Second Circuit law recognizing that parties may seek Rule 65 relief even where they have agreed to arbitration. *Am. Exp. Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998) ("[C]ourts should consider the merits of a requested preliminary injunction even where the validity of the underlying claims will be determined in arbitration."); *General Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-CV-181, 2020 WL 915824, at *3 (S.D.N.Y Feb. 26, 2020) ("Arbitration can become a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute.").

Courts have "wide discretion" in determining whether to grant temporary injunctive relief. *Almontaser v. N.Y.C. Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008). "The standard for an injunction seeking to preserve the status quo pending arbitration is the same as for preliminary injunctions generally." *Convergen Energy LLC v. Brooks*, No. 20-CV-3746 (LJL), 2020 WL 5549039, at *18 (S.D.N.Y. Sept. 16, 2020). Under this standard, courts evaluate the following four factors to determine if injunctive relief pursuant to Rule 65 is warranted:

1. Whether the movant is likely to suffer irreparable harm in the absence of injunctive relief;

2. The likelihood of success on the merits of the movant's claim;

3. Whether the balance of equities tips in the movant's favor; and

4. Whether an injunction is in the public interest.

*Basank v. Decker*, 449 F. Supp. 3d 205, 210 (S.D.N.Y. 2020). "[T]he standard for an entry of a TRO is the same as for a preliminary injunction." *Id.* (quotation omitted).

As discussed below, each of these factors supports the issuance of a temporary restraining order and preliminary injunction prohibiting Walland from further violating his restrictive covenants until such time as the parties' dispute has been resolved by mediation or arbitration.

## I.  Plaintiffs Will Suffer Irreparable Harm if Walland Is Not Enjoined from Violating His Noncompete Obligations

Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). It exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

Here, this factor weighs decisively in favor of granting injunctive relief under Rule 65 for several reasons. First, in Section VII(e) of his Employment Agreement, Walland stipulated that Medicrea "would suffer immediate, material, and irreparable harm" if he violated his noncompete obligations, which he has done here by going to work for Alphatec. Contractual stipulations of this type provide strong evidence of irreparable harm. *See, e.g.*, *Sulzer Mixpac AG v. DXM Co.*, No. 19 CIV. 9404 (LAP), 2020 WL 3619047, at *4 (S.D.N.Y. July 2, 2020) (granting preliminary injunction based, in part, on contractual stipulation that breach would cause irreparable harm); *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *34 (S.D.N.Y. Oct. 25, 2018) (same); *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 348 (S.D.N.Y. 2018) (stating that contractual irreparable harm stipulations, "while not dispositive, support a finding of irreparable harm" in the Second Circuit).

Second, based on a spreadsheet sent by Lobinsky, it appears that Walland has *already* disclosed Plaintiffs' confidential information in violation of contractual obligations. (Benson Decl. ¶ 18.) This improper disclosure of confidential information constitutes irreparable harm and is

16

indicative of the threat Walland poses to Plaintiffs unless he is temporarily restrained and preliminarily enjoined from providing further services to Alphatec and EOS. *See Capstone*, 2018 WL 6786338, at *33–34 (finding irreparable harm based on the defendant's use of confidential information); *Ayco Co. v. Frisch*, 795 F. Supp. 2d 193, 205 (N.D.N.Y. 2011) ("[T]he loss of an employer's confidential customer information also constitutes irreparable harm.").

Third, as evident from Alphatec's letter and Lobinksky's emails, Walland is actively assisting Medicrea's competitors (Alphatec and EOS) and already leading sales efforts for Alphatec (and potentially the entity that will result when Alphatec and EOS finish their combination). This is a clear violation of Walland's noncompete obligations and poses an actual and imminent threat to Plaintiffs' client relationships, customer goodwill, confidential information, and trade secrets. "[W]hen a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm." *Ayco*, 795 F. Supp. at 205 (quotation omitted); *Mercer Health*, 307 F. Supp. 3d at 347–48 (finding irreparable harm based on violation of restrictive covenant); *Capstone*, 2018 WL 6786338, at *33-34 (same). Moreover, "numerous courts . . . have found irreparable harm where a senior executive with proprietary knowledge of a company's inner workings violates a non-compete agreement." *Gen. Mills*, 2020 WL 915824, at *9; *Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 536–37 (S.D.N.Y. 2016), *amended*, 2016 WL 2731588 (S.D.N.Y. May 3, 2016) (finding irreparable harm where movant faced losing business to a former "high-level company official").

Fourth, the extent of the harm Walland has caused (and is likely to continue to cause) Plaintiffs is difficult, if not impossible, to quantify. As the Second Circuit has acknowledged, it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to

come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999). Based on this, courts routinely find irreparable harm where, as here, the defendant's conduct threatens the movant's customer relationships. *See, e.g., Mercer Health*, 307 F. Supp. 3d at 347 (finding irreparable harm because the "total monetary value" of lost clients could not be "calculate[d] with any exactitude"); *Marsh USA*, 183 F. Supp. 3d at 536 (finding likelihood of irreparable harm based on prospective lost clients and rejecting notion that such damages could be tracked). The threat of trade secret disclosure by a former employee constitutes irreparable harm for similar reasons because the loss of a trade secret "cannot be measured in money damages." *Int'l Bus. Machs. Corp. v. Lima*, No. 7:20-CV-04573 (PMH), 2020 WL 5261336, at *14 (S.D.N.Y. Sept. 3, 2020).

## II.     Medtronic Is Likely to Succeed on the Merits of its Claims

To establish a likelihood of success on the merits, Plaintiffs "need not show that success is an absolute certainty." *Broker Genius, Inc. v. Volpone*, 313 F. Supp.3d 484, 497 (S.D.N.Y. 2018). Instead, they "need only make a showing that the probability of [their] prevailing is better than fifty percent." *Id*. Plaintiffs easily clear this threshold.

### A.     Section X's Dispute Resolution Procedures Are Valid and Enforceable

Section X of the Employment Agreement states that it is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq*. (Wolf Decl. Ex. A.) The FAA "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate," and it reflects the "liberal federal policy favoring arbitration agreements." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quotations omitted). Therefore, federal courts are required "to enforce 'privately made agreements to arbitrate' as they would any other contract." *Nunez v. Citibank, N.A.*, No. 08CV5398 (BSJ), 2009 WL 256107, at *2 (S.D.N.Y. Feb. 3, 2009) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985)); *see Morelli v. Alters*, No. 1:19-CV-10707-GHW, 2020 WL 1285513, at *7, 10 (S.D.N.Y. Mar. 18, 2020)

"Whether one can be bound by an arbitration clause is usually determined by looking at generally accepted principles of contract law." *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004). Pursuant to these principles, "a party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such an obligation." *Lebovits v. Cavalry Portfolio Servs., LLC*, No. 20-CV-01116 (KMK), 2021 WL 1198967, at *5 (S.D.N.Y. March 29, 2021). Walland cannot show special circumstances here, and his agreement to Section X's dispute resolution procedures is valid as a result. *See id.* at *6. Moreover, by its terms, Section X applies to "any dispute arising out of or relating to [the Employment] Agreement or [Walland's] employment with the Company." (Wolf Decl. Ex. A.) This dispute clearly falls within the scope of Section X given its focus on the restrictive covenants in the Employment Agreement.

### B.   Walland's Restrictive Covenants Are Valid and Enforceable

As explained above, Plaintiffs have put forth evidence that Walland is in breach of his noncompete restrictions. Based on Alphatec's letter, it appears that Walland intends to contest the enforceability of these restrictions. (*Id.* Ex. I.) Walland, however, is contractually precluded from doing so. In Section 3.1 of his Separation Agreement, Walland expressly "waive[d] and release[d] any claim that the restrictions in Section VII of the Medicrea Employment Agreement are not reasonable and enforceable as written." (*Id.* Ex. B.) He likewise "acknowledge[d] that these post-employment restrictions (concerning, for example, Confidential Information, Non-competition, and Non-solicitation obligations entered into and to be enforced pursuant to New York law) shall survive this Release and remain in effect in accordance with their terms." (*Id.*) Moreover, in Section 4.2, Walland agreed that a "material purpose" of the Separation Agreement was "to avoid disputes over the enforceability" of his restrictive covenants and "to ensure Walland's compliance with them." (*Id.*) He further promised "not to contest the enforceability" of these restrictions. (*Id.*)

Even without these provisions, Plaintiffs would have no difficulty showing in arbitration that Walland's noncompete restrictions are valid and enforceable. Under New York law, a noncompete is enforceable if it is (1) reasonable in duration and scope, (2) "necessary to protect the employer's legitimate interests," (3) "not harmful to the general public," and (4) "not unreasonably burdensome to the employee." *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999)). Walland's noncompete restrictions satisfy this test.

### 1.     The Duration and Scope of the Walland's Restrictions are Reasonable

New York law requires restrictive covenants to be reasonable in time and scope. *Ticor Title*, 173 F.3d at 69-70. Walland's noncompete restrictions are limited to one year (subject to extension for any period in which Walland is in breach). (Wolf Decl. Ex. A § VII(e).) New York courts have repeatedly found restrictions of one year and longer to be reasonable. *See, e.g.*, *Mercer Health*, 307 F. Supp. 3d at 349 (one-year); *Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 651 N.Y.S.2d 504, 505 (N.Y. App. Div. 1996) (two-year).

Walland's noncompete restrictions are likewise limited in scope. Walland is merely prevented from engaging in "Competitive Activity," which is narrowly defined to include services of the type Walland performed at Medicrea and about which he had confidential information. (Wolf Decl. Ex. A. § VII(e).) Specifically, Walland cannot do the following:

1. perform services that are the "same or similar to the services [he] performed" as Medicrea's CEO for anyone "engaged (or about to be engaged) in the manufacturing marketing and/or sale of spinal implants"; or

2. perform services for, or participate with, anyone that is "engaged (or is attempting to become engaged) in the then-existing business activities of the UNiD project, including, without limitation, the development, marketing, sales, and/or training of patient-specific implants used for spinal surgeries, including patient-specific implants used in cervical, lumbar, thoracic, sacral or iliac spine procedures."

(Id. §§ VII(e)(1)(a), VII(e)(1)(d).) Significantly, these restrictions does not preclude Walland from working for all companies in the medical device industry. Rather, his restrictions extend only to (a) companies engaged in the manufacture, marketing, or sale of spinal implants in the parts of the United States where Medicrea does the same; and (b) companies engaged in patient-specific implants used for spinal surgeries. Outside of these limited categories, Walland is free to take employment at any entity, including countless companies in the medical device industry in the United States, during his one-year restricted period.

### 2. Walland's Restrictions Serve to Protect Plaintiffs' Legitimate Business Interests

New York law permits the use of restrictive covenants to protect an employer's legitimate interests, which include "(1) protection of trade secrets, (2) protection of confidential customer information, (3) protection of the employer's client base, and (4) protection against irreparable harm where the employee's services are unique or extraordinary." *Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 694 (S.D.N.Y. 2017) (quotation omitted). These types of interests will be served by the enforcement of Walland's restrictions to bar him from his present role at Alphatec.

In Section VII(e) of his Employment Agreement, Walland acknowledged that, "in the course of his employment" with Medicrea, he "has and will become familiar with [Medicrea's] trade secrets and confidential information" and that his "services will be of special, unique, and extraordinary value" to Medicrea. (Wolf Decl. Ex. A.) In *International Business Machines*, the court found, based on a similar contractual provision, that the departing executive had "acknowledged IBM's legitimate interests in the information" it was seeking to protect through the enforcement of the noncompete at issue. 2020 WL 5261336, at *9.

As detailed above, Walland had extensive involvement in most, if not all, aspects of Medicrea's business—and in particular, played a key role in Medicrea's sales efforts and

relationships with customers and distributors. He likewise was intimately involved in Medicrea's integration into Medtronic and its strategic plans post-acquisition. As a result, there can be no legitimate dispute that Walland—Medicrea's former CEO—has substantial knowledge of Plaintiffs' trade secrets and confidential information, including confidential customer information.

Walland will be able to exploit this knowledge and Medicrea's customer goodwill in his new position. Alphatec admits that Walland is providing services relating to spinal implant sales (as it must given that his title is Vice President of Sales Channel Development). Nonetheless, Alphatec frivolously contends that Walland's position does not implicate his restrictions because he "is multiple steps removed from the CEO-level" and "not responsible for activities such as running ATEC's corporate operations, general corporate planning and growth initiatives, hiring, leading, and developing corporate leadership, and participating in investor meetings." (Wolf Decl. Ex. I.) But Alphatec's argument ignores Walland's extensive sales-related activities as Medicrea's CEO. Moreover, it grossly misconstrues the nature of Walland's restrictions, which do not simply bar Walland from serving as Alphatec's CEO, but instead prohibit him from performing services that are the "same or similar" to those he "performed in his role as CEO" of Medicrea. Thus, Walland is restricted from performing not only the services listed by Alphatec, but also the other services he performed at Medicrea, which included activities integral to the sale of Medicrea's products that compete directly with those sold by Alphatec and EOS.

Walland's duties at Alphatec clearly fall within these parameters based on his job title alone. Further, Plaintiffs have already uncovered evidence suggesting that he has disclosed Medicrea's confidential information. (*See* Benson Decl. ¶ 18.) To perform his duties—such as leading sales-related discussions at Alphatec's and EOS's upcoming joint meeting on April 12, 2021—Walland will have to further rely on Medicrea's confidential information.

Thus, his work for Alphatec poses a clear threat to Medicrea's customer goodwill, trade secrets, and confidential customer information. Accordingly, to protect these legitimate business interests, New York law authorizes Plaintiffs to apply Walland's restrictions to bar him from working as Alphatec's Vice President of Sales Channel Development during his restricted period. *See Int'l Bus. Machs.*, 2020 WL 5261336, at *7-9, 15 (preliminarily enjoining departing IBM executive from working in similar role at Microsoft).

### C.    California Law Does Not Govern Walland's Restrictive Covenants

Walland expressly agreed that his Employment Agreement, including his noncompete restrictions, "shall be governed by and construed under the laws of the State of New York, without regard to its conflict of laws principles." (Wolf Decl. Ex. A § X.) He reaffirmed this agreement in his Separation Agreement, acknowledging that his noncompete restrictions were "entered into and to be enforced pursuant to New York law." (*Id.* Ex. B Art. 3.1.)

Despite the plain language of these agreements, Alphatec contends that Walland's noncompete restrictions are governed by California law and are, therefore, unenforceable pursuant to Cal. Bus. & Prof. Code § 16600. But, as noted above, Walland waived and released any right he had to contest the enforceability of these restrictions, including any claim pursuant to the California Labor Code and California Business and Professions Code. (*Id.*) Moreover, Walland worked for Medicrea in New York and resided there for the majority of his tenure as CEO. He has no basis to contend that California law should trump the written New York choice-of-law provision governing his restrictive covenants. *Ayco*, 795 F. Supp. 2d at 200-04 (enforcing New York choice-of-law provision and finding that California law did not apply to restrictive covenant claims at issue).

## III.    The Balance of Equities Favors Temporary Injunctive Relief Against Walland

To evaluate the balance of equities factor, courts compare the movant's alleged harm against the harm an injunction would inflict on the opposing party. *Basank*, 449 F. Supp. 3d at 215.

Here, this balance tips in Plaintiffs' favor for multiple reasons. First, Walland's noncompete restrictions were "freely bargained for as part of a negotiated contract." *Capstone*, 2018 WL 6786338, at \*34. Walland voluntarily agreed to these restrictions when he executed his Employment Agreement and expressly acknowledged their reasonableness when he declined Medtronic's employment offer and subsequently executed his Separation Agreement. (Wolf Decl. Ex. B Art. 3.1.) Moreover, Walland received substantial compensation pursuant to those agreements, including monetary payments specifically linked to the noncompete restrictions. These facts weigh in Plaintiffs' favor and against Walland. *Capstone*, 2018 WL 6786338, at \*34.

Second, Walland cannot "claim an inability to earn a livelihood." *Id.* As explained above, Walland's restrictions are narrowly tailored to protect Plaintiffs' legitimate interests and reasonable in scope and duration. When he separated from Medtronic, Walland explicitly negotiated to receive enough money to tide him over until he could find new employment, which he expected might take some time given his restrictive covenants; as a result of those negotiations, Walland agreed to accept $132,500, and he cannot now legitimately claim financial hardship based on his noncompete restrictions. Nor can Walland legitimately claim that it is inequitable for him to have to abide by the restrictions to which he voluntarily agreed and for which he was paid $50,000.

Third, Plaintiffs will suffer significant harm if Walland is permitted to continue violating his contractual obligations. Walland appears to have already disclosed Plaintiffs' confidential information and is currently managing sales efforts for Medicrea's direct competitors. As detailed above, the harm this misconduct poses to Plaintiffs easily outweighs any hardship Walland may suffer simply from having to abide by his restrictive covenants.

## IV.    The Public Interest Favors the Enforcement of Contractual Agreements

Public interest considerations also weigh in favor of granting injunctive relief under Rule 65. "It is a well settled principle under New York law that when parties set down their agreement

in a clear, complete document, their writing should as a rule be enforced according to its terms." *Int'l Bus. Machs*, 2020 WL 5261336, at *11 (quotation omitted).[5]

The situation here is directly analogous to that presented in *International Business Machines*. Like Walland, the departing executive in that case was a sophisticated party and had "accepted good and valuable consideration for the restrictions" contained in his employment agreement. *Id*. The district court found that, based on these facts, "the public interest would be advanced" by an injunction enforcing the executive's noncompete because "such an injunction would tend to encourage parties to abide by their agreements." *Id.* (quotation omitted).

The present case is no different. Walland is merely being asked to comply with the agreements he willingly entered into, and for which he received valuable consideration. Enforcing these restrictions will advance, rather than harm, any interest the public may have in this dispute.

## CONCLUSION

For the reasons set forth above, Plaintiffs are entitled to a temporary restraining order and preliminary injunction to prevent Walland from continuing to violate his restrictive covenants until such time as the dispute between the parties has been resolved by mediation or arbitration. Plaintiffs' motion should be granted.

---

[5] As discussed above, Walland's restrictive covenants are subject to an express New York choice-of-law provision. California law has no interest in these covenants.

Respectfully submitted,

**GREENBERG TRAURIG LLP**

Dated: New York, New York
    April 8, 2021

By:    _/s/ James W. Perkins_

James W. Perkins
Eric Sigda
Adam Kirschbaum
Met Life Building
200 Park Avenue
New York,  NY  10166
Telephone:  (212) 801-9200
perkinsj@gtlaw.com
sigdae@gtlaw.com
kirschbauma@gtlaw.com

-AND-

William Z. Pentelovitch (MN #85078)
(*pro hac vice to be submitted*)
John C. Duffey (MN #0392157)
(*pro hac vice to be submitted*)
Peter C. Hennigan (MN #031089X)
(*pro hac vice to be submitted*)
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140
Telephone: (612) 672-8200
bill.pentelovitch@maslon.com
john.duffey@maslon.com
peter.hennigan@maslon.com

**ATTORNEYS FOR PLAINTIFFS**

26