GREENBERG TRAURIG LLP
James W. Perkins
Eric Sigda
Adam Kirschbaum
Met Life Building
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-9200
perkinsj@gtlaw.com
sigdae@gtlaw.com
kirschbauma@gtlaw.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEDTRONIC, INC., MEDTRONIC SOFAMOR DANEK, INC., MEDTRONIC SOFAMOR DANEK USA, INC., AND MEDICREA USA, CORP., <br><br> Plaintiffs, <br><br> -against- <br><br> JOSEPH F. WALLAND, JR., <br><br> Defendant. | CASE NO. 1:21-CV-02908 (EG) (OTW) |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR
<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

TABLE OF CONTENTS

ARGUMENT ................................................................................................................................. 1

I. Walland's Choice-of-Law Analysis Is Fundamentally Flawed ....................................... 1

   A. Controlling New York Precedent Prohibits the Court from Conducting a Conflicts Analysis .................................................................................................................. 1

   B. Walland Has Not Shown that California Law Applies .................................................... 2

II. Walland Mischaracterizes New York Noncompete Law .................................................. 4

III. Walland Ignores and Misrepresents Numerous Facts ....................................................... 6

CONCLUSION .............................................................................................................................. 9

## ARGUMENT

I.     **Walland's Choice-of-Law Analysis Is Fundamentally Flawed**

Walland argues that the Court can disregard the parties' New York choice-of-law provision in favor of California law. Walland is wrong.

    A.     **Controlling New York Precedent Prohibits the Court from Conducting a Conflicts Analysis**

Because the Court is sitting in diversity, its choice-of-law analysis is governed by New York law. *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *20 (S.D.N.Y. Oct. 25, 2018). In *Ministers & Missionaries Benefit Board. v. Snow*, the New York Court of Appeals unequivocally held that "New York courts ***should not engage in any conflicts analysis*** where the parties include a choice-of-law provision in their contract." 26 N.Y.3d 466, 474 (2015) (emphasis added). Performing such an analysis "contravene[s] the primary purpose of including a choice-of-law provision in a contract—namely, to avoid a conflict-of-laws analysis and its associated time and expense." *Id.* at 475. This is precisely the bargain Medicrea and Walland struck here.

"Courts since *Ministers* have held in light of that case that New York courts ***no longer engage in any conflicts analysis*** where the parties have agreed to a valid choice of law provision." *Capstone*, 2018 WL 6786338, at *21; *see also 2138747 Ontario, Inc. v. Samsung C & T Corp.*, 144 A.D.3d 122, 128 (1st Dep't 2016) (stating that *Ministers* "clarif[ied] that New York courts are also ***prohibited from engaging in a conflict-of-law analysis*** where the parties include a choice-of-law provision in their contract" (emphasis added)); *Gottwald v. Sebert*, 79 N.Y.S.3d 7, 8 (App. Div. 2018) (citing *Ministers* and rejecting argument that contract should be terminated for violating California Labor Code § 2855 on the basis that "the unambiguous New York choice-of-law

provisions contained in the agreements preclude the application of that California statute").[1] Accordingly, under *Ministers*, the Court is precluded from conducting the conflicts analysis Walland suggests—and must instead enforce the New York choice-of-law provision that Walland voluntarily agreed to in his Employment Agreement and expressly acknowledged in his Separation Agreement.

### B. Walland Has Not Shown that California Law Applies

*Ministers* determines the outcome here. Nevertheless, even if a conflicts analysis were appropriate (and it is not), it would show that the parties' New York choice-of-law provision governs this dispute. Prior to *Ministers*, New York law treated contractual choice-of-law provisions as follows: "Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000). To apply this rule, courts generally employed the "substantial relationship" approach stated in Section 187 of the Restatement (Second) of Conflict of Laws. *See, e.g.*, *Ayco Co., L.P. v. Frisch*, 795 F. Supp. 2d 193, 200-01 (N.D.N.Y. 2011); *Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 170 (S.D.N.Y. 2006). Under this approach, a contractual choice-of-law provision will be enforced "unless (1) the chosen state has no substantial relationship to the parties; or (2) applying the law of the chosen state would contravene a fundamental policy of a state that has a materially

---

[1] Numerous other courts have heeded *Ministers*' instruction and enforced contractual choice-of-law provision without conducting a conflicts analysis. *See, e.g.*, *Tanzanian Royalty Exploration Corp. v. Crede CG III, Ltd.*, No. 18 CIV. 4201 (LGS), 2019 WL 1368570, at *14 n. 9 (S.D.N.Y. Mar. 26, 2019); *Horton v. Dow Jones & Co., Inc.*, No. 18 CIV. 4027 (LGS), 2019 WL 952314, at *1 n.1 (S.D.N.Y. Feb. 27, 2019), *aff'd*, 804 F. App'x 81 (2d Cir. 2020); *Buckley v. Nat'l Football League*, No. 18 CIV. 3309 (LGS), 2018 WL 6198367, at *2 (S.D.N.Y. Nov. 16, 2018); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 596 & n. 176 (S.D.N.Y. 2018).

greater interest than does the chosen state." *Ayco*, 795 F. Supp. 2d at 200-01. Walland cites this rule in his brief—but he fails to present any argument showing that either prong applies. (*See* Def.'s Br. 16-18.)

Walland could not have done so had he tried. New York clearly has a "substantial relationship" to the parties given, among other reasons, that Walland resided and worked in New York for the majority of his tenure as Medicrea's CEO. Likewise, California does not have a "materially greater interest" than New York. Indeed, courts have applied New York choice-of-law provisions against employees with far greater connections to California than Walland claims here. For example, in *Ayco*, 795 F. Supp. 2d at 201-02 and *Batra*, 430 F. Supp. 2d at 160-61, 171-72, the defendants lived and worked in California throughout their employment; conversely, Walland lived and worked in New York from July 2018 through at least March 2020, or for roughly 21 of the 30 months he served as Medicrea's CEO. Walland exaggerates his connections to California. For instance, he claims that his move to California in March 2020 was permanent (Walland Decl. ¶ 7); yet he previously represented to Medicrea that it was only temporary due to the COVID pandemic (Wolf Decl. ¶ 13). Walland likewise claims that he was in California when he executed his Employment Agreement on July 30, 2018 (Walland Decl. ¶ 3); however, he also states that he was living in New York that same month, casting doubt on Walland's claim and indicating, at the very least, that he was a New York resident by the time he executed the agreement (*id.* ¶ 12).

Moreover, Walland ignores that Medicrea's principal place of business is in New York. (Compl. ¶ 6.) The court in *Batra* found that the employer's New York principal place of business pointed decisively toward New York, making it impossible to find that California had a "materially greater" interest:

> Just as California has a strong interest in protecting those employed in California, so too does New York have a strong interest in

3

> protecting companies doing business here in keeping with New York's recognized interest in maintaining and fostering its undisputed status as the preeminent commercial and financial nerve center of the Nation and the world. . . . Accordingly, ***based upon New York's policy of enforcing restrictive covenants that are reasonable in time and scope and given New York's interest in having a predictable body of law that companies can rely on when employing individuals who will have close contact with trade secrets and confidential information,*** it is concluded that California's interest is not "materially greater" than New York's.

430 F. Supp. 2d at 173-74 (emphasis added) (quotation omitted); *see Ayco*, 795 F. Supp. 2d at 201-02 (holding that California did not have materially greater interest than New York because the employer was headquartered in New York and "all of its significant internal groups and divisions" were based there). The same is true here.

## II.   Walland Mischaracterizes New York Noncompete Law

Walland contends that Plaintiffs must show that he has *already* solicited customers or disclosed confidential information in order to establish that the restrictive covenants in Walland's Employment Agreement serve a protectable interest. (Def.'s Br. 18.) This goes too far and would defeat the prophylactic purpose of protecting good will and confidential information that restrictive covenants are designed to serve. That is why New York courts, and federal courts interpreting New York law, have found restrictive covenants enforceable without any evidence of actual solicitation or disclosure. For example, in *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1222 (N.Y. 1999), there was no evidence that the former employee had actually solicited former clients or used the plaintiff's confidential information. Nevertheless, the court found that the restrictive covenant was enforceable because it protected the plaintiff's legitimate business interest in the "goodwill of a client or customer, which had been created and maintained at [BDO's] expense." *Id.* at 1225.

Likewise, in *International Business Machines, Corp. v. Lima*, No. 7:20-CV-04573 (PMH), 2020 WL 5261336, at *9 (S.D.N.Y. Sept. 3, 2020), the departing executive "acknowledged that

4

his employment by IBM gave him access to, and knowledge of, IBM Confidential Information as well as relationships with customers of IBM at the time and expense of IBM." Even though the departing executive had not actually disclosed any confidential information to his new employer, the court nonetheless found thatIBM had a legitimate interest in protecting its confidential information and could protect that interest by enforcing the restrictive covenant at issue. *Id.*

And in *Continental Group, Inc. v. Kinsley*, 422 F. Supp. 838, 842 (D. Conn.1976) (applying New York law), the former employee, a development engineer in the plastic container industry, signed a restrictive covenant in which he agreed that he would not work in a "competitive enterprise" for a period of eighteen months. Even though there was no proof of actual disclosure, but only the "risk of disclosure," the court held that restrictive covenant was reasonable and enforceable. *Id.* at 844-45.

Here, Walland does not dispute that, as Medicrea's CEO, he received confidential and trade secret information and developed personal relationships (at Medicrea's expense) with Medicrea customers. (*See* Wolf Decl. ¶¶ 12, 14-17.) As Alphatec's VP of Sales Channel Development, Walland is now in a position to exploit this confidential and trade secret information and customer goodwill. For example, Walland admits (1) that he is managing and supporting sales personnel, including "the team that negotiates ATEC's ability to sell its implants to hospitals" and that he is "evaluating markets to identify potential markets for increased ATEC investment." (Def.'s Br. 7, 13.) These duties clearly overlap with his duties as Medicrea's CEO, and his knowledge of how Medicrea approaches these tasks will be invaluable in his new role. (*See* Wolf Decl. ¶¶ 12, 14-17.) Likewise, Walland cannot deny that Alphatec, through its proposed acquisition of EOS, is "attempting to become engaged" in the business of selling patient-specific implants within the meaning of Section VII(e)(1)(e) of his Employment Agreement—ATEC's slide deck touting the

5

benefits of this deal says so explicitly. (Benson Decl. Ex. A at 9-15.) Alphatec's foray into patient-specific implants directly implicates Walland's extensive knowledge of Medicrea's UNiD business and the trade secrets relating thereto.[2] Under New York law, Plaintiffs are entitled to restrict Walland from working for Alphatec in a capacity that threatens these aforementioned legitimate interests, among the others detailed in Plaintiffs' opening brief.

**III.  Walland Ignores and Misrepresents Numerous Facts**

Several key facts receive little or no attention in Walland's brief, including:

- ***Walland's Release in the Separation Agreement.*** Pursuant to Article 3.1, Walland expressly waived and released any claim that his restrictive covenants were "not reasonable and enforceable as written." (Wolf Decl. Ex. B.)

- ***Walland's Involvement with the April 12, 2021 QPR Meeting.*** The agenda for this meeting indicates a significant degree of collaboration and coordination between Alphatec and EOS concerning products well beyond EOS Imaging machines. (*Id.* Ex. G.) According to the agenda, Walland was to speak to Alphatec's sales forces about the pending acquisition of EOS concerning "Sales Alignment and what is required today as well as expectations to come," and "What to do with leads today," as well as the compensation structure for sales representatives and timelines. (*Id.*)

- ***Walland's failure to disclose his employment at Alphatec.*** Walland repeatedly stresses that Plaintiffs were "unaware" that he began working for Alphatec on December 31, 2020. That is true: Medicrea first learned of Walland's new employment on March 30th, promptly demanded

---

[2] Walland asserts that his role concerning the potential transaction has thus far been limited, but he does not disclose what his duties will be post-acquisition and makes no indication that they will be limited to traditional spinal implant systems (which, in any event, are still directly competitive with Medicrea products).

6

that he cease and desist, and commenced this action within a week of learning of his new employment. Moreover, Walland neglects to inform the Court that he actively concealed this information from Plaintiffs. In fact, during the negotiation of the Separation Agreement in January 2021, Walland blatantly misrepresented his employment status, claiming he needed additional money to abide by his restrictive covenants because they might limit his job prospects and the speed with which he could find new employment—even though he was *already* working at Alphatec. (Cargill Decl. ¶ 3.) Moreover, Walland's LinkedIn profile still states that he is CEO of Medicrea; he has not updated his profile to reflect his new role, further concealing his Alphatec employment from Plaintiffs (and potentially misleading Medicrea's actual and potential customers).

Walland also distorts several facts to attempt to reduce his role and attempt to show that he is not engaging in competition. However, the facts demonstrate that Walland is engaged in direct competition with Plaintiffs, including:

- ***Patient Specific Implants.*** Walland's opposition papers create the misleading impression that Medicrea's business is focused "almost exclusively" on patient-specific implants. That is untrue; patient-specific implants represent the minority of Medicrea revenues. (Second Declaration of Nicholas Benson ("Second Benson Decl.") ¶ 4.) Medicrea derives the majority of its revenues from the sale of rods and screws that compete with rods and screws sold by Alphatec. (*Id.*) While he was CEO of Medicrea, Walland had direct responsibility for all aspects of Medicrea's rods and screws business in the United States, and based on his opposition papers, it appears that he also has direct responsibility for the sale of Alphatec's competitive rods and screws. (*Id.*)

- ***Competition amongst manufacturers of traditional spinal implant systems.*** Walland's opposition papers inaccurately describes the nature of the market in which Medicrea and Alphatec compete. Medicrea does not simply sell patient-specific rods. Rather, it also sells other types of spinal implant hardware, including interbody devices, non-patient-specific rods, and screws. (*Id.* ¶¶ 5-6.) In 2020, there were many spine procedures performed in the United States using Medicrea products that did not involve a patient-specific rod, and several of Medicrea's surgeon customers performed procedures without patient-specific rods in 2020. (*Id.* ¶ 7.) Moreover, there are many procedures that place Medicrea's patient-specific rods using hardware manufactured by Alphatec and other competitors instead of Medicrea's pedicle screws. (*Id.* ¶¶ 9-11.) Because screws account for the vast majority of the revenue from patient-specific implant procedures, Medicrea has worked very hard to convert customers from competitive hardware to Medicrea hardware. (*Id.* ¶¶ 8, 11)

- ***Medicrea's October 31, 2017 Letter to Stryker***. Walland disingenuously suggests this letter demonstrates that all of his Medicrea-related duties concerned Medicrea's UNiD product. First, and most importantly, the letter was written when Walland held a different position at Medicrea, some nine months before he become CEO. Second, the letter simply states that his "primary role" as Medicrea's VP of Sales will concern that product; it says nothing about what Walland's other roles were at the time nor anything about whether or not Walland would become Medicrea's CEO in the future or what the scope of Walland's duties might be were he to become Medicrea's CEO. The letter also does not say anything about Medicrea's traditional spinal implant systems (such as the PASS LP screw system), Walland's involvement with those systems as CEO, or whether those systems compete with Stryker products.

- ***$50,000 payment pursuant to Section 2.2 of the Separation Agreement***. Walland claims that the $50,000 payment he received from Plaintiffs was "in consideration of [his] unpaid

8

commissions" and "had nothing to do with the restrictive covenants in the Employment Agreement or with Walland's fears of difficulty in finding new employment based on such covenants." (Def.'s Br. 6.) These claims are false and directly refuted by Section 4.2 of the Separation Agreement, which states in relevant part:

> A material purpose of this Agreement is to avoid disputes over the enforceability of the Surviving Protective Covenants as written and to ensure Walland's compliance with them. Medtronic's agreement to pay Walland the amount provided for in Section 2.2, and Walland's agreement not to contest enforceability of the Surviving Protective Covenants are mutually dependent items of consideration.

(Wolf Decl. Ex. B; *see also* Cargill Decl. ¶¶ 3-5.) Moreover, the Separation Agreement contains an integration clause which "supersedes any prior arrangements, agreements, or contract, whether written, oral or implied (in law or fact) between them and contains the entire understanding and agreement between the parties." (Wolf Decl. Ex. B § 4.7.) Walland cannot now claim that the $50,000 he received was not paid to "ensure Walland's compliance" with the restrictive covenants in his Employment Agreement.

## CONCLUSION

For the reasons set forth above and in their opening brief, Plaintiffs respectfully request that the Court grant their motion and enjoin Walland from continuing to violate his restrictive covenants until such time as the dispute between the parties has been resolved by mediation or arbitration.

<table>
<tr><td>Dated: New York, New York<br>April 14, 2021</td><td>**GREENBERG TRAURIG LLP**<br><br>By:_____<br>James W. Perkins<br>Eric Sigda<br>Adam Kirschbaum<br>Met Life Building<br>200 Park Avenue<br>New York, NY 10166<br>Telephone: (212) 801-9200<br>perkinsj@gtlaw.com<br>sigdae@gtlaw.com<br>kirschbauma@gtlaw.com<br><br>-AND-<br><br>William Z. Pentelovitch (MN #85078)<br>(*pro hac vice*)<br>John C. Duffey (MN #0392157)<br>(*pro hac vice*)<br>Peter C. Hennigan (MN #031089X)<br>(*pro hac vice pending*)<br>3300 Wells Fargo Center<br>90 South Seventh Street<br>Minneapolis, MN 55402-4140<br>Telephone: (612) 672-8200<br>bill.pentelovitch@maslon.com<br>john.duffey@maslon.com<br>peter.hennigan@maslon.com<br><br>**ATTORNEYS FOR PLAINTIFFS**</td></tr>
</table>