UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MEDTRONIC, INC., MEDTRONIC
SOFAMOR DANEK, INC.,
MEDTRONIC SOFAMOR DANEK
USA, INC., and MEDICREA USA,
CORP.,

       Plaintiffs,

– against –

JOSEPH F. WALLAND, JR.,

       Defendant.

**OPINION AND ORDER**

21 Civ. 2908 (ER)

Ramos, D.J.:

  On April 5, 2021, Plaintiffs filed this suit against Joseph F. Walland, Jr. Doc. 1. Pending before the Court is Plaintiffs' motion for preliminary injunction, which seeks to require Walland to mediate and, if necessary, to arbitrate the dispute pursuant to resolution procedures in the employment and separation agreements he signed with Plaintiffs, as well as to enjoin Walland from performing activities allegedly prohibited by those agreements. Doc. 11.

  For the reasons set forth below, Plaintiffs' motion for preliminary injunction is DENIED.

**I. BACKGROUND**

  **A. Factual Background**

  Medtronic, Inc. ("Medtronic")—along with its affiliates Medtronic Sofamor Danek, Inc.; Medtronic Sofamor Danek USA, Inc.; and Medicrea USA, Corp. ("Medicrea")—are global healthcare solutions companies. Doc. 12 ¶¶ 1–7. Headquartered in New York, Medicrea specifically has been a wholly owned indirect subsidiary of Medtronic since November 13, 2020, and specializes in the design,

manufacturing, and distribution of spinal implants and related technology. *See* Docs. 13 ¶ 3 and 14 ¶ 2. In 2017, Medicrea hired Walland as its vice president of sales. *See* Doc. 28 ¶¶ 2. At that time, he resided in California. *See id.* ¶¶ 2–3. Walland was then promoted as the company's CEO in July 2018 and remained in that position until his voluntary departure in December 2020. *See id.* ¶¶ 2, 6–7.

Walland entered into an Employment Agreement when he was promoted as CEO of Medicrea. *See* Docs. 12-1 and 28. Walland alleges that he negotiated and executed this agreement while he lived in California. Doc. 28 ¶ 3. The Employment Agreement contains a non-disclosure provision, in which Walland agrees not to "disclose to any unauthorized Person or use for his own account any" information, observations, or data obtained "during the course of his performance of his duties" at Medicrea "concerning the business and affairs" of the company without its prior written consent, unless such information becomes publicly known. Doc. 12-1 § 7(b)(1). The Employment Agreement also contains a non-compete provision. *Id.* § 7(e). According to that provision, Walland agrees that he will not "engage in any Competitive Activity" during his employment and a period of twelve months afterwards. *Id.* § 7(e). "Competitive Activity" includes, directly or indirectly, the following:

> (a) performing any services (whether as an employee . . . or otherwise) that are the same or similar to the services [Walland] performed in his role as CEO . . . in the manufacture, marketing and/or sale of spinal implants anywhere in the United States in which the Company Group manufactures, markets and/or sells spinal implants;
>
> . . .
>
> (d) performing any services (whether as an employee . . . or otherwise), or participating in any manner (including as an investor), with any Person that is engaged (or is attempting to become engaged) in the then-existing business activities of the UNiD project, including, without limitation, the development, marketing, sales, and/or training of patient-specific implants used for spinal surgeries, including patient-

> specific implants used in cervical, lumbar, thoracic, sacral or iliac spine procedures . . . .

*Id.* § 7(e)(1).

The Employment Agreement further provides that Medicrea may seek and obtain injunctive relief to prevent violations of the Employment Agreement. *Id.* § 7(f). Additionally, the Employment Agreement sets forth a three-step dispute resolution process: (1) good faith discussions, (2) mediation, and (3) arbitration. *Id.* § 10. Further, the Employment Agreement states that it "shall be governed by and construed under the laws of the State of New York, without regard to its conflict of laws principles." *Id.* Moreover, the Employment Agreement contains a survival clause, which provides that Walland's obligations to refrain from "Competitive Activities" survive any termination of the Employment Agreement. *See id.* § 11(c). The Employment Agreement also states that, in the event that another company acquires Medicrea, Walland could voluntarily terminate his employment and receive a severance package. *See id.* § 6(d).

Shortly after executing the Employment Agreement, Walland moved to New York. Doc. 28 ¶ 3. Less than two years later, in March 2020, Walland moved back to California and has resided there since. *See id.* ¶ 7. On November 13, 2020, Medtronic purchased Medicrea. *See* Doc. 12-2 at 1. Walland thereafter chose to exercise his right to a voluntary termination under the Employment Agreement. *See id.* Pursuant to the Employment Agreement, Medtronic owed Walland $81,250 as severance. *See id.* § 2.1.

Walland also entered into a Separation Agreement with Medtronic on January 7, 2021. *Id.* at 7. Pursuant to that agreement, Walland was paid an additional $50,000 for, among other things, his release of any claims that the restrictive covenants are unenforceable. *Id.* §§ 2.2, 3.1. More specifically, the Separation Agreement provides that Walland "waives and releases any claim that the restrictions in Section VII of the" Employment Agreement—*i.e.*, the restrictive covenants—"are not reasonable and enforceable as written, and acknowledges that these post-employment restrictions

(concerning, for example, Confidential Information, Non-competition, and Non-solicitation obligations entered into and to be enforced pursuant to New York law) shall survive this Release and remain in effect in accordance with their terms." *Id.* § 3.1.  The Separation Agreement also states that Walland releases all claims under the California Business and Professions Code, with the exception of a few sections not relevant here. *Id.*  Relatedly, the Separation Agreement states that "[a] material purpose of this Agreement is to avoid disputes over the enforceability of the [surviving restrictive covenants] . . . and to ensure Walland's compliance with them," and that "Medtronic's agreement to pay Walland the full [$50,000], and Walland's agreement not to contest the enforceability of the [restrictive covenants] are mutually dependent items of consideration." *Id.* § 4.2.  Further, although the Separation Agreement provides that, generally, California law governs its terms, it notes that California law does not govern where "expressly indicated with respect to the" surviving restrictive covenants. *Id.* § 4.8.

On December 10, 2020, Walland terminated his employment with Medicrea. Doc. 14 ¶ 2.  On December 31, 2020, Walland began working as the vice president for sales at Alphatec Spine, Inc. (Alphatec), a spinal implant company focused on surgical approaches and productions for minimally invasive and traditional open spinal surgeries. Docs. 28 ¶ 9 and 30 ¶¶ 2, 4.

The parties dispute the extent to which Plaintiffs and Alphatec compete with each other in the spinal-implant market.  While acknowledging that the two companies provide products and services to be used in the surgical treatment of spinal conditions, Walland contends that the companies have products and services with different uses, that target different pathologies, and that have different users.  Doc. 30 ¶ 3.  According to Walland, Alphatec does not market or sell preoperative software planning or patient-specific products, focusing on traditional spinal implants instead.  *Id.*  By contrast, according to Walland, Medicrea offers a limited suite of traditional implants, instead focusing on patient-specific products.  *See* Doc. 28 ¶ 4.

4

However, Plaintiffs allege that there is significant overlap in the market served by Medicrea and Alphatec. According to Plaintiffs, patient-specific implants constitute a minority of Medicrea's revenues; indeed, Plaintiffs represent that approximately 75% of Medicrea's revenue since January 2020 came from the sale of non-patient specific products, such as screws, rods, and interbody devices. *See* Doc. 31 ¶ 4. Further, Plaintiffs note that, on December 17, 2020, Alphatec and EOS Imaging, Inc. ("EOS")—a global medical device company that provides imaging and software services, and whose software can prepare measurements and assessments for spinal fusion surgery—announced that they had entered into an agreement through which Alphatec would acquire EOS.[1] Doc. 13 ¶¶ 6–8, 11. According to that press release, the acquisition would facilitate patient-specific implants and pre-surgical planning to improve inventory efficiency. *Id.* ¶ 12; *see also* Doc. 13-1 at 11–16.

On March 30 and 31, 2021, Medicrea received two emails at Walland's email account there. Doc. 13 ¶¶ 15–16. Those emails, addressed to Walland and two other officers at Alphatec, were from the CEO of EOS, and they included two spreadsheets. Docs. 13-2 to 13-5. One of those emails contained an agenda for an April 12, 2021 meeting, during which Alphatec and EOS were to discuss compensation structure and sales strategy. *See* Doc. 13-5. Moreover, according to the declaration of Nicholas Benson, a senior director at Medicrea, one of the spreadsheets "contained information that appears to me to have been derived from confidential Medicrea information of which Walland had knowledge," although neither Benson nor any other affiant specifies what that information was or how it can be inferred that the information was derived from Medicrea's confidential information. Doc. 13 ¶¶ 1, 8. According to Plaintiffs, these emails and the attached spreadsheets indicate that Walland is taking part in strategic conversations with Alphatec, in violation of the Employment and Separation Agreements.

---

[1] At the April 14, 2021 hearing, Plaintiffs represented that the acquisition was still pending, and have not represented otherwise to the Court since.

5

Doc. 13 ¶ 18. Further, on information and belief, Plaintiffs allege that Walland is acting or planning to act as a sales leader for Alphatec and EOS. *Id.* On April 2, 2021, Plaintiffs demanded that Walland cease and desist all activities that violated those agreements, and soon after pursued mediation regarding these issues. Doc. 12-8.

**C. Procedural History**

Plaintiffs filed the instant suit on April 5, 2021. Doc. 1. On April 8, 2021, Plaintiffs filed their motion for a temporary restraining order and preliminary injunction. Doc. 11. Specifically, Plaintiffs sought an injunction requiring Walland to mediate and, if necessary, to arbitrate the dispute pursuant to resolution procedures set out in the agreements, as well as to enjoin Walland from performing activities prohibited by the Employment Agreement on behalf of Alphatec. *See id.* On April 9, 2021, the Court issued an order to show cause regarding that motion. Doc. 17. On April 14, 2021, the parties appeared for a hearing on the motion, which the Court took under advisement. With leave of the Court, Walland and Plaintiffs filed supplemental briefing, respectively, on April 15, 2021 and April 16, 2021. Docs. 35 and 38.

**II.   DISCUSSION**

**A. Legal Standard**

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995)). A party seeking a preliminary injunction must show:

> (1) a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that

> the public interest would not be disserved by the issuance of an injunction.

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quotation omitted).

### B. Analysis

#### 1. Likelihood of Success on the Merits

##### a. Choice of Law

The parties dispute whether New York or California law governs this suit. Generally, where, as here, "jurisdiction is predicated on diversity of citizenship, a federal court must apply the choice-of-law rules of the forum state." *Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015). Accordingly, the Court must apply the choice-of-law rules of New York. *See id.* Of course, the Court must engage in a choice-of-law analysis only where there is an actual conflict of law between the two jurisdictions. *See Liang v. Progressive Cas. Ins. Co.*, 172 A.D.3d 696, 697 (N.Y. App. Div. 2019).

Regardless of whether there is a conflict, however, Plaintiffs contend that, under New York law, the Court cannot conduct a choice-of-law analysis. As an initial matter, the Employment Agreement contains a choice-of-law provision stating that its terms "shall be governed by and construed under the laws of the State of New York, without regard to its conflict of law principles." Doc. 12-1 § 10. That choice-of-law provision applies notwithstanding the choice-of-law provision in the Separation Agreement—which states that its terms are to be construed under California law—as the Separation Agreement states that the restrictive covenants within the Employment Agreement are not subject to the choice-of-law provision of the Separation Agreement. Doc. 12-2 § 4.8. In other words, New York law is the chosen law regarding the issues in the instant suit.

Plaintiffs also argue that, under New York choice-of-law rules, the presence of a choice-of-law provision bars the Court from conducting a conflicts-of-law analysis, and the Court must adhere to the law chosen by the parties—that is, New York law. *See*

*Ministers & Missionaries Benefit Bd. v. Snow*, 45 N.E.3d 917, 919 (N.Y. 2015). Walland disagrees, contending that, while New York courts generally enforce choice-of-law provisions, they do not enforce such provisions under certain circumstances—namely, where the chosen law bears no reasonable relationship to the parties or the transaction, or where the chosen law violates some fundamental policy of a state that has a materially greater interest than does the chosen state. *See Brown & Brown, Inc. v. Johnson*, 34 N.E. 3d 357, 360 (N.Y. 2015); *Askari v. McDermott, Will & Emery, LLP*, 179 A.D.3d 127, 147–48 (N.Y. App. Div. 2019).

The Court agrees with Walland. Plaintiffs are correct that, "[u]nder New York law, 'courts will generally enforce choice-of-law clauses,' because 'contracts should be interpreted so as to effectuate the parties' intent.'" *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018) (quoting *Ministers*, 45 N.E.3d at 919). However, although "contractual selection of governing law is generally determinative," courts will not adhere to such a selection where there is fraud, violation of public policy, or insufficient contacts between the State selected and the transaction. *United States v. Moseley*, 980 F.3d 9, 20 (2d Cir. 2020) (quotation omitted). Put another way, New York courts will not enforce a choice-of-law provision where (1) the chosen law bears no reasonable relationship to the parties or the transaction or (2) where the chosen law violates some fundamental policy of a state that has a materially greater interest than does the chosen state. *See Brown & Brown*, 34 N.E. 3d at 360 (citing *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500–01 (N.Y. 2006)); *see also EMA Fin., LLC v. NFusz, Inc.*, 444 F. Supp. 3d 530, 540 (S.D.N.Y. 2020); *TGG Ultimate Holdings, Inc. v. Hollett*, 224 F. Supp. 3d 275, 282 (S.D.N.Y. 2016); *Medicrea USA, Inc. v. K2M Spine, Inc.*, No. 17 Civ. 8677 (AT), 2018 WL 3407702, at *8 (S.D.N.Y. Feb. 7, 2018).

Plaintiffs argue that the New York Court of Appeals's decision in *Ministers* eliminated these exceptions. At issue in that case was whether a choice-of-law provision stating that a contract would be governed by New York law required the application of a

New York statutory choice-of-law directive. *Ministers*, 45 N.E.3d at 919–20. Notably, neither party in that suit contested whether they were bound by New York substantive law; what was contested was whether the choice-of-law provision required the application of the statutory choice-of-law directive, which would have resulted in the application of another jurisdiction's law—in contravention of the choice-of-law provision in the contract. *See id.* at 919–20, 923. The Court of Appeals stated that "New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract," thereby barring application of the New York statutory choice-of-law directive. *See id.* at 922, 924. According to Plaintiffs, then, *Ministers* forecloses any conflicts-of-law analysis where, as here, there is a choice-of-law provision in a contract.

The Court disagrees. Albeit in a summary order, the Second Circuit noted that, while *Ministers* held that New York courts generally honor a choice-of-law provision, the Court of Appeals "did not have cause to address the status of prior law recognizing that the parties' choice of law must yield to a conflicting law reflecting the 'fundamental public policy' of a state with a 'materially greater interest' in the dispute than the chosen state." *Capstone Logistics Holding, Inc. v. Navarrete*, 736 F. App'x 25, 26 (citing *Brown & Brown*, 34 N.E.3d at 360). Indeed, in *Ministers*, neither party contested that the choice-of-law provision in the contract meant that New York law applied to the case, meaning that the Court of Appeals had no reason to examine any potential exceptions that barred the application of the choice-of-law provision. *See* 45 N.E.3d at 919–20, 922. And tellingly, despite purportedly overturning cases that recognized these long-standing exceptions—such as *Welsbach* and, more recently, *Brown & Brown*—the Court of Appeals in *Ministers* does not mention those exceptions in its analysis, thereby supporting a conclusion that the holding in *Ministers* is far narrower than Plaintiffs suppose.

9

Moreover, since *Capstone*, the Second Circuit has maintained that exceptions to the application of a choice-of-law provision—including for the violation of public policy—still exist. *Moseley*, 980 F.3d at 20. And even after *Ministers*, New York appellate courts continue to apply such exceptions, further undermining the broad interpretation of *Ministers* that Plaintiffs urge. *See, e.g.*, *Askari*, 179 A.D.3d at 147–48. Indeed, after *Ministers*, the Court of Appeals has stated that New York courts "*generally* enforce choice-of-law clauses"—not that such clauses are applied without exception. *See, e.g.*, *Deutsche Bank Nat'l Trust Co. v. Barclays Bank PLC*, 140 N.E.3d 511, 519 (N.Y. 2019) (emphasis added).

Plaintiffs note that some courts in this District have concluded that, based on *Ministers*, New York courts are foreclosed from conducting a choice-of-law analysis where, as here, there is a choice-of-law provision governing the parties' dispute. *See, e.g.*, *Tanzanian Royalty Exploration Corp. v. Crede CG III, Ltd.*, No. 18 Civ. 4201 (LGS), 2019 WL 1368570, at *14 n.9 (S.D.N.Y. Mar. 26, 2019). But other courts in this District have held otherwise, including in factual scenarios more similar to the instant suit. *See, e.g.*, *Medicrea*, 2018 WL 3407702, at *8. More importantly, because jurisdiction is predicated on diversity of citizenship, the Court must base its analysis on the case law of the forum state's appellate courts. And as noted, New York appellate courts continue to apply these exceptions even after *Ministers*. Moreover, to the extent that the Court, although sitting in diversity, is bound by the Second Circuit's interpretation of New York law rather than that of the intermediate New York appellate courts, *see Adebiyi v. Yankee Fiber Control, Inc.*, 705 F. Supp. 2d 287, 291 n.4 (S.D.N.Y. 2010), the Second Circuit's decision in *Moseley* requires that it recognize exceptions to the application of a choice-of-law provision, *see* 980 F.3d at 20.

Plaintiffs also attempt to distinguish these cases, arguing that they merely stand for the proposition that choice-of-law provisions may be deemed unenforceable when parties choose the law of a jurisdiction outside of New York; here, by contrast, the parties

10

chose New York law, so according to Plaintiffs, those exceptions do not apply. Of course, Plaintiffs are correct that those cases dealt with choice-of-law provisions in which the parties had selected the law of a foreign jurisdiction, and those courts in turn analyzed whether the law of that jurisdiction or New York applied. But at issue in those cases was whether the law of a foreign jurisdiction applied even though the suit was brought in New York; those courts, in other words, had no reason to comment on a situation in which the parties selected New York but the law of another jurisdiction arguably governed. Especially in light of the longstanding principles applied to choice-of-law provisions irrespective of the jurisdiction selected, *see Capstone*, 736 F. App'x at 26, Plaintiffs point to no case law from the Court of Appeals indicating that the analysis differs based on whether New York or another jurisdiction has been selected by the parties. Accordingly, the interests of a foreign jurisdiction are still relevant to the Court's conflicts-of-law analysis.

  The Court must therefore determine whether there is an actual conflict of law that renders a choice-of-law analysis necessary. Under California law, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. In other words, California law bars restrictive covenants. By contrast, under New York law, a restrictive covenant is enforceable through an injunction if the covenant is (1) "reasonable in time and area," (2) "necessary to protect the employer's legitimate interests," (3) "not harmful to the general public," and (4) "not unreasonably burdensome to the employee." *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999) (quotation omitted); *see also Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 348–49 (S.D.N.Y. 2018). Accordingly, the Court concludes that there is an actual conflict between the jurisdictions.

  Because there is a conflict, the Court must determine whether the choice-of-law provision is unenforceable under New York law. Again, New York courts will not enforce a choice-of-law provision where (1) the chosen law bears no reasonable

11

relationship to the parties or the transaction or (2) where the chosen law violates some fundamental policy of a state that has a materially greater interest than does the chosen state.  Regarding the first prong, Walland lived and worked in New York between the summer of 2018 until November 2020, and Medicrea is headquartered in New York, so there is certainly a reasonable relationship between the parties and the transaction.  Accordingly, to determine whether the choice-of-law provision is enforceable, the Court must to turn the second prong, determining whether California has a materially greater interest than New York and whether New York law violates some fundamental policy of California.  *See Medicrea*, 2018 WL 3407702, at *9.

First, to determine the interests that each state has, New York courts examine the factors outlined in § 188 of the Restatement (Second) of Conflict of Laws:  the place of contracting, negotiation, and performance; the location of the subject matter of the contract; and the domicile of the contracting parties.  *See GlobalNet Financial.com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 383 (2d Cir. 2006) (citing Restatement (Second) of Conflict of Laws § 188(2)); *see also Medicrea*, 2018 WL 3407702, at *9.  As noted, New York certainly has some interest in the matter.  But these factors strongly favor California, as Walland lived in California at the time he entered the Employment Agreement, negotiated and executed the Employment Agreement in California, negotiated and executed the Separation Agreement while in California, and currently resides in California, thus enjoying the benefits of both agreements there.  Accordingly, the Court concludes that California has a materially greater interest than New York does in this matter.  *See Medicrea*, 2018 WL 3407702, at *9; *see also TGG*, 224 F. Supp. 3d at 282–83.

Second, the Court must determine whether New York law violates some fundamental policy of California.  The Court concludes that it does.  Again, California law invalidates "*every* contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind."  Cal. Bus. & Prof. Code. § 16600 (emphasis

12

added). The Supreme Court of California's "recent statement on section 16600 underscores how strictly the state understands the statutory proscription on professional restraints. Analyzing the genesis of the law, the court explained 'that section 16600 evinces a settled legislative policy in favor of open competition and employee mobility.'" *Golden v. Cal. Emergency Physicians Med. Grp.*, 782 F.3d 1083, 1091 (9th Cir. 2015) (quoting *Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 291 (Cal. 2008)). Accordingly, "[s]ection 16600 has specifically been held to invalidate employment contracts which prohibit an employee from working for a competitor when employment has been terminated, unless necessary to protect the employer's trade secrets." *Medicrea*, 2018 WL 3407702, at *9 (quoting *TGG*, 224 F. Supp. 3d at 283); *see also AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App. 5th 923, 940 (Cal. Ct. App. 2018) (distinguishing between confidential information and trade secrets). "New York, by contrast, tolerates non-compete covenants, subjecting them to an overriding limitation of reasonableness," thereby restricting protections against such covenants. *Medicrea*, 2018 WL 3407702, at *9 (quotation omitted). Moreover, because section 16600 "makes certain contract terms illegal" and "works to protect individual employees who typically have inferior bargaining power over the terms of their employment," the statute represents California's fundamental public policy. *Id.* at *10; *see also* Restatement (Second) of Conflict of Laws § 187. Thus, because California has a materially greater interest than does New York, and because New York law would violate a fundamental public policy of California, the law of California governs the instant suit, contrary to the choice-of-law provision. *See Medicrea*, 2018 WL 3407702, at *9–10; *TGG*, 224 F. Supp. 3d at 283.

b. Application of California Law

Having concluded that California law applies, the Court turns to analyzing the provisions of the agreements here. Again, the Separation Agreement provides that

Walland waives and releases any challenge that the restrictive covenants at issue are unenforceable.

In California, waiver means the intentional relinquishment or abandonment of a known right. *Lynch. v. Cal. Coastal Comm'n*, 396 P.3d 1085, 1088 (Cal. 2017). Waiver requires (1) an existing right, (2) the waiving party's knowledge of that right, and (3) the party's actual intention to relinquish that right. *Id.* The intent to waive may be express, based on the waiving party's words. *Id.*

Here, the Separation Agreement manifests that Walland intended to relinquish his right to challenge the enforceability of the restrictive covenants in exchange for $50,000. Walland avers that the $50,000 had nothing to do with the restrictive covenants; instead, according to Walland, that money compensated him for the commission he earned in 2020. Doc. 28. But the plain language of the Separation Agreement expressly states the parties' intention regarding consideration, and that language governs the Court's analysis. *See Skidgel v. Cal. Unemployment Ins. Appeals Bd.*, No. S250149, --- P.3d ----, ----, 2021 WL 3671434, at *4–5 (Cal. Aug. 19, 2021). Thus, if the right to challenge the enforceability of an agreement under section 16600 is waivable, then Walland has waived his ability to challenge the enforceability of the restrictive covenants.

However, the Court concludes that Walland's rights under section 16600 are not waivable. Section 16600 "does not specifically target covenants not to compete between employees and their employers." *Golden*, 782 F.3d at 1090. After all, "the text does not include any form of the word 'compete' or 'competition,' and does not even implicitly constrain itself to contracts concerning employment." *Id.*; *see also Edwards*, 189 P.3d at 291. "Rather, section 16600 voids '*every* contract' that 'restrain[s]' someone 'from engaging in a lawful profession, trade, or business.'" *Golden*, 782 F.3d at 1090 (quoting Cal. Bus. & Prof. Code § 16600); *see also Edwards*, 189 P.3d at 291. Critically, a contract that bars an employee from challenging the enforceability of a restrictive covenant, in effect, restrains that employee from engaging in a lawful profession, trade,

14

or business.  *See* Cal. Bus. & Prof. Code § 16600; *see also Golden*, 782 F.3d at 1090–91. Thus, according to its plain language, section 16600 bars agreements that waive a challenge against the enforceability of a restrictive covenant.  Further, in California, where a contract provides that an employee has released any and all claims, courts do not read that waiver provision to encompass statutorily nonwaivable rights.  *See Edwards*, 189 P.3d at 297.  Accordingly, the Court concludes that the non-compete, non-solicitation, and confidentiality provisions are void pursuant to section 16600.[2]  *See Medicrea*, 2018 WL 3407702, at *13–14; *see also Golden*, 782 F.3d at 1092; *Edwards*, 189 P.3d at 292; *AMN Healthcare*, 28 Cal. App. 5th at 940.  Plaintiffs have therefore failed to establish that they are likely to succeed on the merits.[3]

### 2. Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation omitted).  To satisfy the irreparable harm requirement, a plaintiff must show that, "absent a preliminary injunction[, it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Id.* (quotation omitted).  "[W]hen a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable

---

[2] The Court notes that California appellate courts have not declared whether section 16600's protections are waivable, and unlike some California statutes, section 16600 lacks an explicit anti-waiver provision.  *See Rowen v. Soundview Commc'ns, Inc.*, No. 14 Civ. 5530 (WHO), 2015 WL 899294, at *6 n.4 (N.D. Cal. Mar. 2, 2015).  Nevertheless, the Court concludes that section 16600's use of "*every* contract" plainly indicates that any contract that imposes or allows for the imposition of the restraints at issue falls within the statute's proscription.

[3] The Court notes that the parties focus almost exclusively on the non-compete provision in their arguments, mentioning the non-disclosure provision only in passing.  For the sake of completeness, the Court also concludes that Plaintiffs have failed to establish a likelihood of success on the merits for any relief based on the non-disclosure provision.  To the extent that the non-disclosure provision survives the effect of section 16600, *see Medicrea*, 2018 WL 3407702, at *14, and as detailed more thoroughly in the Court's analysis regarding irreparable harm, Plaintiffs plead only in a conclusory fashion that Walland has used and relied on any information deemed confidential under the Employment Agreement.

harm." *Int'l Bus. Machs. Corp. v. De Freitas Lima*, 20 Civ. 4573 (PMH), 2020 WL 5261336, at *14 (S.D.N.Y. Sept. 3, 2020) (quotation omitted), *aff'd sub. nom. Int'l Bus. Machs. Corp. v. Lima*, 833 F. App'x 911 (2d Cir. 2021) (summary order). Although not dispositive, courts in this District have concluded that a contractual acknowledgement by the defendant that a violation of a non-compete clause would cause irreparable harm supports a finding of irreparable harm. *See, e.g., id.*

Plaintiffs argue that they will suffer irreparable harm if Walland continues to work for Alphatec. First, Plaintiffs note that Walland stipulated in the Employment Agreement that Medicrea would suffer irreparable harm if he violated the restrictive covenants. Second, based on the spreadsheets sent to Walland's Medicrea email account on March 30, 2021, Plaintiffs argue that Walland has already disclosed their confidential information, asserting that some information on that spreadsheet appears to have been derived from Medicrea's confidential information. Third, Plaintiffs contend that Walland is actively assisting Medicrea's competitors—namely, Alphatec and EOS. And fourth, Plaintiffs argue that the alleged harm is impossible to quantify and, therefore, irreparable.

Walland disagrees. Regarding the emails and spreadsheets, Walland argues that, at most, Plaintiffs have shown that EOS—a separate entity from Alphatec—attempted to send compensation plans concerning the sale of products that Plaintiffs do not offer. Further, Walland emphasizes that these emails were part of a disclosure concerning a potential transaction that he would not even work on. And more broadly, Walland asserts that the alleged harm is too speculative, representing that he has not solicited any clients of Plaintiffs.

The Court concludes that this factor favors Plaintiffs, but only slightly. Plaintiffs have shown that there is significant, though not complete, overlap between the markets that Medicrea and Alphatec—especially with EOS—serve. Specifically, the Court notes that both Medicrea and Alphatec earn their revenue primarily through non-patient-specific implants, and will likely overlap with respect to patient-specific implants and

software products once Alphatec has acquired EOS. However, that acquisition has not yet been finalized. And more significantly, much of the harm Plaintiffs highlight borders on speculative. Even assuming that Walland's responsibilities at Medicrea overlap significantly with his responsibilities at Alphatec, Plaintiffs allege in only a conclusory fashion that Walland is acting or planning to act as a sales leader for Alphatec and EOS. Moreover, although Plaintiffs allege one of the spreadsheets attached to the March 30, 2021 email contained information that was derived from propriety knowledge, Plaintiffs fail to indicate how they have arrived at that conclusion—or on what basis the Court can infer such a fact. *See* Doc. 13 ¶ 8. And as Plaintiffs acknowledged at the April 14, 2021 conference, they have received no reports from their customers indicating that Walland was trying to contact them, and they point to no other evidence even suggesting that they have lost customers or business as a result of Walland's work with Alphatec. So although the market overlap between the companies and potential loss of good will weigh in favor of finding that Plaintiffs will suffer irreparable harm, these other facts cut against such a finding. Accordingly, the Court concludes that this factor only slightly favors Plaintiffs.

### 3. Balance of the Hardships

An injunction would impose a hardship on Walland because it would bar him from his current employment, and given Medicrea's nationwide market, he would likely be barred from working anywhere else in the country that overlaps with his specialty. *See Medicrea*, 2018 WL 3407702, at *11. Further, if enjoined, Walland will be deprived of the benefits of California law—specifically, its prohibition on anticompetitive restraints. *See id.* By contrast, absent an injunction, Plaintiffs may lose some business and customers, but as noted, there has been no evidence yet of such a loss. And given that Medicrea and Alphatec do not completely overlap in the spinal implant market, there is less certainty that Medicrea will suffer any loss of customers. Accordingly, the Court concludes that this factor favors Walland.

### 4. Public Interest

The Court concludes that an injunction would not serve the public interest. Plaintiffs argue that an injunction here would encourage parties to abide by their agreements. However, "worker mobility is paramount," so enjoining Walland "would be contrary to the public interest." *See id.* at *14 (quotation omitted). Although Plaintiffs are correct that the public interest is served by encouraging parties to abide by their contracts, the public interest requires that the terms of those contracts conform with the pertinent controlling law. To that end, Walland has an interest "protected by California law, which prioritizes the interests of the employee in his own mobility and betterment over the business interests of the employers." *Id.* (quotation omitted). Accordingly, the public interest favors Walland.

5. *Summary*

Based on all four factors, Plaintiff have failed to show that a preliminary injunction should be issued.

### III.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction is DENIED. The parties are directed to appear for a telephonic initial conference on October 21, 2021 at 4:15 p.m. The parties are directed to call (877) 411-9748 at that time and dial access code 3029857, followed by the pound (#) sign. The Clerk of Court is respectfully directed to terminate the motion. Doc. 11.

It is SO ORDERED.

Dated:   September 10, 2021
         New York, New York

                                                       _____
                                                       EDGARDO RAMOS, U.S.D.J.